FRESARD v MICHIGAN MILLERS MUTUAL INSURANCE
COMPANY

Docket No. 65261. Argued November 9, 1981 (Calendar No. 2).—
Decided December 7, 1982. Rehearing denied 417 Mich 1103.

George Fresard, Donald Fresard, George Fresard, Jr., Thomas
Fresard, Fresard Building Company, Inc., and Fresard Builders,
Incorporated, were sued by the purchasers of a lot for breaches
of warranties involving the quality of the lot and the fitness of
a house they built on it, as well as for personal injury. An
inappropriate drain had caused the foundation of the house to
be undermined. The standard drain tile material used in the
drain's construction was inadequate because of an abnormal
ground condition. Michigan Millers Mutual Insurance Com-
pany, the builders' insurer under a comprehensive general
liability policy, agreed to participate in the suit, reserving its
rights under the policy. Before the completion of the trial, a
settlement was reached, by which the insurer and the builders
paid equal shares. The builders then brought an action for a
declaratory judgment that the insurer was obligated to pay the
entire amount of the settlement under the terms of its policy.
The Macomb Circuit Court, George R. Deneweth, J., granted
summary judgment for the builders. The Court of Appeals,
M. J. Kelly, P.J., and D. F. Walsh and Beasley, JJ., affirmed
(Docket No. 46110). The defendant insurer appeals.

The decision of the Court of Appeals was affirmed by an
equally divided Court.

Chief Justice Fitzgerald, joined by Justices Coleman and
Ryan, would hold that the insurer is not liable to indemnify the
builders. The comprehensive general liability insurance policy
purchased by the builders from the insurer excluded coverage
for damages which arose out of construction work and which
were confined to the building itself. Nor did the policy provide
coverage for bodily injury or property damage claims which

REFERENCES FOR POINTS IN HEADNOTES
[1] 43 Am Jur 2d, Insurance § 271.
[2-6] 43 Am Jur 2d, Insurance § 269 et seq.

arose out of a planning error and which were not the result of an active malfunction. The exclusionary provisions in the policy were unambiguous in their deletion of such coverage.

1. The standardized comprehensive general liability policy specifies the protection afforded by the policy as well as the exclusions to coverage in clear and unambiguous language and does not conflict with public policy or statutory law. The basic coverage of the policy includes claims for bodily injury and property damage and would obligate the insurer to pay such claims were it not for the enumerated exclusions. Under the policy, coverage for a particular claim is lost if any exclusion is applicable. Coverage for the type of claims excluded must be obtained by the purchase of an indorsement adding the desired coverage or deleting the specific exclusion.

2. Exclusionary clauses in insurance contracts never grant coverage, but rather limit the scope of the basic protection. Therefore an exception to an exclusionary clause cannot be read as a grant of coverage which is not subject to other exclusionary clauses. Each exclusion is meant to be read with the basic agreement, independently of every other exclusion, *seriatim,* and not cumulatively. One exclusion cannot be regarded as inconsistent with another, because one exclusion bears no relationship to another.

3. In this case, any liability assumed by the builders under the contract with the purchasers of the property is excluded under exclusion (a), except where the liability arises under a warranty of fitness or quality of the builders' products or a warranty that work performed by or on behalf of the builders be done in a workmanlike manner. Were this the only exclusion, the insurer would be liable. However, because this exception is not a grant of coverage, independent examination of further exclusions and exceptions to exclusions is necessary to determine the extent of coverage.

Exclusion (k) deletes coverage for damages caused by a design or planning error except for bodily injury or property damage resulting from the active malfunctioning of the builders' products or work. Although the drainage system selected was inappropriate for the soil conditions, it did not "malfunction". Thus, the exception to exclusion (k) does not reinstate coverage.

Finally, exclusion (m) denies coverage where damage is caused by the work itself, or any parts, materials, or equipment used in the project. In other words, the insurer denies liability where the builders were negligent or otherwise responsible for damage to the project. The damage in this case arose from the

installation of the inappropriate drainage system, and under exclusion (m) liability is precluded.

Justice Kavanagh, joined by Justices Williams and Levin, would hold that the contract of insurance in this case is ambiguous and should be construed against its drafter and in favor of coverage. If one fair reading of the entire contract leads to an understanding that there is coverage under particular circumstances and another fair reading leads to an understanding that there is no coverage under the same circumstances, then the contract is ambiguous. This is such a contract.

97 Mich App 584; 296 NW2d 112 (1980) affirmed by an equally divided Court.

OPINION BY FITZGERALD, C.J.

1. INSURANCE — CONSTRUCTION OF POLICY — AMBIGUITY — PUBLIC POLICY.

*Any clause in an insurance policy is valid as long as it is clear, unambiguous, and not in contravention of public policy.*

2. INSURANCE — CONSTRUCTION OF POLICY — EXCLUSIONS.

*Coverage under a policy of insurance is lost if any exclusion contained in the policy is applicable to a claim at issue.*

3. INSURANCE — CONSTRUCTION OF POLICY — REASONABLE EXPECTATIONS.

*The expectation that a contract of insurance will be enforceable other than according to its terms is not reasonable; to allow a party to bind another to an obligation not covered under the contract because that party thought the other was bound is neither reasonable nor just.*

4. INSURANCE — CONSTRUCTION OF POLICY — EXCLUSIONS.

*Exclusionary clauses in insurance contracts never grant coverage, but rather limit the scope of the basic protection; each exclusion is meant to be read with the basic agreement, independently of every other exclusion, seriatim, and not cumulatively; one exclusion cannot be regarded as inconsistent with another because one exclusion bears no relationship to another.*

5. INSURANCE — CONSTRUCTION OF POLICY — EXCLUSIONS.

*An insurer was not liable to insured builders for personal injury or property damage under a standard comprehensive general liability policy where the damages arose out of the construction effort, were confined to the building itself, stemmed from a planning error, and were not the result of an active malfunc-*

*tion and where the policy specifically excluded such coverage in clear and unambiguous language.*

OPINION BY KAVANAGH, J.

6. INSURANCE — CONSTRUCTION OF POLICY — AMBIGUITY.

*A contract of insurance which, given fair readings, leads one reader to conclude that under particular circumstances there is coverage and another reader to conclude that, under the same circumstances, there is not is ambiguous and should be construed against its drafter and in favor of coverage.*

*Hill, Lewis, Adams, Goodrich & Tait* (by *C. Peter Theut* and *William A. Moore)* for plaintiffs.

*Conklin, Benham, McLeod, Ducey & Ottaway, P.C.* (by *Martin L. Critchell),* for defendant.

FITZGERALD, C.J. This case requires us to construe certain exclusion clauses in the comprehensive general liability insurance policy purchased from defendant by plaintiffs. We hold that the policy did not provide coverage for the claims at issue and that defendant insurance company, therefore, is not liable to indemnify plaintiffs. Accordingly, the judgment of the Court of Appeals is reversed.

## I

Plaintiffs are builders who, beginning in 1968, purchased comprehensive general liability policies from defendant insurance company in connection with the development of a residential area called White Oaks Subdivision. Plaintiffs subsequently contracted with William and Delphine Harding for the construction of a house on one of the subdivision lots.

According to the parties' stipulation of facts, the Hardings alerted plaintiffs to an accumulation of

water in the basement of the house after the
foundation was laid, but before the structure was
finished. Nonetheless, the house was completed
and the transaction closed in November, 1970.

Almost immediately after moving into their new
dwelling, the Hardings began experiencing difficul-
ties with excess water in the basement. Gradually
the foundation began to deteriorate; the concrete
floor collapsed and the walls caved in. Plaintiffs
attempted repairs over several years, ultimately
installing a replacement drainage system in early
1976.

According to the parties' stipulation, the stan-
dard drain tile material that had been used when
the house was built was inadequate because the
ground condition was abnormal. Sand, some of
which came from beneath the footings, flowed into
the drainage system through an opening and was
carried away. This gradually undermined the sub-
structure. The replacement "poroswall" system
remedied the difficulty.

The Hardings eventually sued plaintiffs, alleging
breaches of warranties regarding the quality of
their lot and fitness of their house, as well as
personal injury (emotional upset). Plaintiffs noti-
fied defendant insurance company, which agreed
to participate in the suit on the condition that all
rights be reserved under its contract with plain-
tiffs. After several days of trial, a settlement was
reached in which plaintiffs and defendant each
paid the Hardings $25,000.

A provision of the settlement was that the dis-
pute between plaintiffs and defendant over insur-

ance coverage be resolved through a motion for declaratory relief. Plaintiffs subsequently initiated such an action. The trial court found in plaintiffs' favor on cross motions for summary judgment, and the Court of Appeals affirmed. 97 Mich App 584; 296 NW2d 112 (1980). This Court granted leave to appeal. 411 Mich 900 (1981).

## II

It is helpful initially to understand the history and format of the policy under consideration. The first standardized comprehensive general liability policy was drafted more than 40 years ago, with most casualty companies adopting such forms after World War II. Revisions occurred in 1943, 1955, 1966 and 1973. Such a standard policy was in use in 1968 when plaintiffs began purchasing insurance from defendant in connection with the White Oaks Subdivision project.

Although the standard form is called a "general liability automobile policy", it includes basic definitions, conditions and other materials that apply to liability policies in general. This "jacket", together with standard inserts called "coverage parts", forms the complete policy. The inserts spell out the specific protection purchased by the insured.[1]

The particular policy under consideration in this case is a multiple-page document on legal-size

---

[1] Insurers contend that by proceeding this way they achieve standardization and efficiency in underwriting operations. "[B]ut to those not familiar with the relationship, and nonrelationship, of the different parts of this type of policy arrangement, it appears to be a successful attempt at obfuscation by insurers." Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know,* 50 Neb L Rev 415, 419, fn 12 (1971).

paper.[2] The first two pages contain "declarations", information such as the plaintiffs' address, the policy period, liability limits and premium charges.

The coverage details at issue in this case begin on the third page. Four main categories are listed at the top:

I. COVERAGE A—BODILY INJURY LIABILITY
COVERAGE B—PROPERTY DAMAGE LIABILITY
II. PERSONS INSURED
III. LIMITS OF LIABILITY
IV. POLICY PERIOD: TERRITORY

It is with category I that this case primarily is concerned. Category I begins with a general statement of coverage.

"The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
A. bodily injury or
B. Property damage
to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements."

The parties have stipulated that at all times

---

[2] The policy submitted to the Court consists of eight unnumbered pages. The first in order is entitled Part B GENERAL LIABILITY AUTOMOBILE POLICY DECLARATIONS, while the fourth in order is entitled POLICY PROVISIONS—Part A. A statement at the bottom of the first page notes that "THIS PART B, WITH 'POLICY PROVISIONS—PART A', AND COVERAGE PART(S) AND ENDORSEMENT(S), (IF ANY), ISSUED TO FORM A PART THEREOF, COMPLETE(S) THE ABOVE NUMBERED POLICY."

relevant, the policy was in force. They further agree that under the basic coverage statement, defendant would be liable to plaintiffs for the damages which the Hardings claimed.

The next segment of the policy is entitled "Exclusions". There are 15 such exceptions to coverage and several have been debated in the course of this lawsuit. The parties' disagreement now centers on the effect to be accorded three of the exclusions. The entire section is preceded by the statement: "This insurance does not apply:

"(a) to liability assumed by the insured under any contract or agreement except an incidental contract; but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;

"(k) to bodily injury or property damage resulting from the failure of the named insured's products or work completed by or for the named insured to perform the function or serve the purpose intended by the named insured, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any insured; but this exclusion does not apply to bodily injury or property damage resulting from the active malfunctioning of such products or work;

"(m) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith".

It is apparent from a reading of the above that not only are there exclusions to coverage, but there are exceptions to the exclusions.

This Court recently reiterated that "[a]ny clause

in an insurance policy is valid as long as it is clear, unambiguous and not in contravention of public policy". *Raska v Farm Bureau Mutual Ins Co of Michigan,* 412 Mich 355, 361-362; 314 NW2d 440 (1982). The *Raska* majority noted that the only pertinent question was "whether the exclusionary clause in this contract is ambiguous, for if it is not ambiguous we are constrained to enforce it".

As stated by the Eighth Circuit Court of Appeals, "An insurance company may, with the insured's acceptance, insert as many exclusion clauses in its liability policy as it deems proper or necessary as long as they do not conflict with public policy or the statutory law". *Biebel Brothers, Inc v United States Fidelity & Guaranty Co,* 522 F2d 1207, 1210 (CA 8, 1975).

These statements emphasize that freedom of contract is a much- and long-revered doctrine in American jurisprudence. When examining the language of this or any other insurance policy, we are mindful of several other principles of construction so rudimentary as to be axiomatic:

The contract should be viewed as a whole.

The intent of the parties should be given effect.

An interpretation of the contract which would render it unreasonable should be avoided.

Meaning should be given to all terms.

Ambiguities should not be forced.

Conflicts among clauses should be harmonized.

The contract should be viewed from the standpoint of the insured.

The insurer should bear the burden of proving an absence of coverage.

The use of standard policies presents a unique situation in which the precise language we are asked to analyze already has been interpreted by

courts in other jurisdictions. The existence of so many opinions is both an advantage and a disadvantage. The benefit, of course, is the insight provided by learned jurists in other states and in the federal courts. The danger is that weight unfairly may be accorded a view merely because it has withstood attack for a period of time or because it is embraced by the majority of jurisdictions.

### III

We turn now from these prefatory remarks to examine more closely the disputed exclusionary clauses. We note that coverage under the policy is lost if any one exclusion is applicable to the claims at issue. *B A Green Construction Co, Inc v Liberty Mutual Ins Co,* 213 Kan 393; 517 P2d 563 (1973).

It is reasonable to assume that an insured reading the policy exclusions would begin with the first and ask, "What coverage is omitted by this provision?" The insured then would assess whether the deleted coverage was necessary to its venture, a construction project in the case of plaintiffs. If the answer were "yes", the insured then would attempt to reinstate coverage.[3] This procedure would

---

[3] The comprehensive general liability policy purchased by plaintiffs did not include products liability and completed operations coverage. Although that protection was available, it was not automatically included. "On the contrary, this coverage has to be specifically purchased by the insured by so electing on the face of the policy or by purchasing an endorsement which either adds the coverage to or deletes the exclusion of the coverage under the basic policy." Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know,* 50 Neb L Rev 415, 418 (1971). The first page of plaintiffs' policy shows an advance premium paid for comprehensive general liability insurance, but the premium spaces are blank next to the option marked completed operations and products liability insurance. There also is no indication that plaintiffs secured an endorsement. Even if plaintiffs had purchased such coverage, however, it would not have aided them in this case because the

have to be followed in turn for each exclusion. Should a question arise concerning any of the clauses, the prudent insured would discuss it with the insurer. The record in this case is bereft of evidence that such a discussion took place.

The assumption, of course, is that the insured read the policy.

"[T]he expectation that a contract will be enforceable other than according to its terms surely may not be said to be reasonable. If a person signs a contract without reading all of it or without understanding it, under some circumstances that person can avoid its obligations on the theory that there was no contract at all for there was no meeting of the minds.

"But to allow such a person to bind another to an obligation not covered by the contract as written because the first person thought the other was bound to such an obligation is neither reasonable nor just." *Raska v Farm Bureau Mutual Ins Co of Michigan,* 412 Mich 355, 362-363; 314 NW2d 440 (1982).

Our task then is to ascertain whether the insured reasonably should have known *at the time it purchased the insurance policy* that it was not protected from liability for damages such as occurred in this case. Hindsight may be a great teacher, but it cannot be our observation point for this purpose.

---

disputed exclusionary provisions also limit the circumstances under which completed operations and products liability coverage exists. (See later discussion in part III.) The case law is somewhat confusing on this point because many opinions have not distinguished between those situations in which an insured has the completed operations-products liability coverage and those situations in which no such coverage has been purchased. See, for example, *Indiana Ins Co v DeZutti,* 408 NE2d 1275 (Ind, 1980), where the insured had paid a premium for "completed operations hazard" and "products hazard" insurance, and *LaMarche v The Shelby Mutual Ins Co,* 390 So 2d 325 (Fla, 1980), where the insured had only a comprehensive general liability policy.

We begin with exclusion (a), which would omit coverage for any liability plaintiffs assumed under a contract with a third party except an incidental contract. This would remove coverage for damages under the contract between plaintiffs and the Hardings, were it not for the exception to exclusion (a). The exception reinstates coverage where liability stems from "a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner". The parties have stipulated that due to this exception, plaintiffs would have been covered for the claims at issue if exclusion (a) were the only provision to consider.

Plaintiffs would accord the exception to exclusion (a) far greater status, however. The exception is tantamount to a grant of coverage and cannot be canceled by another provision, plaintiffs assert. Further, they insist that an attempted deletion would create such ambiguity as to require that the policy be enforced under plaintiffs' interpretation.

We disagree, for to adopt plaintiffs' logic would require us to ignore the principle that exclusionary clauses *never* grant coverage, but rather limit the scope of the basic protection statement.[4] " '[E]ach exclusion is meant to be read with the insuring agreement, independently of every other exclusion. The exclusions should be read *seriatim,*

---

[4] Apparently the wording of exceptions in the 1966 revised policy was not foreseen as creating any misimpression that there was a grant of coverage. In fact, the language was anticipated to have just the opposite effect. "Present [prior to 1966] policies contain exceptions from the exclusions which led courts in some jurisdictions to conclude that an exception from an exclusion * * * was a grant of coverage. This was not the intent of the insurers. Under the new policy exceptions are stated thus, 'but this exclusion does not apply to;' this unambiguous language avoids any inference that another exclusion may not apply." 3 Long, The Law of Liability Insurance, § 10, p App-41.

not cumulatively. There is no instance in which an exclusion can properly be regarded as inconsistent with another exclusion, since they bear no relationship with one another.' " *Weedo v Stone-E-Brick, Inc,* 81 NJ 233, 248; 405 A2d 788 (1979).

Therefore, since we find that the exception to exclusion (a) is not a grant of coverage, it is necessary to examine independently exclusions (k) and (m). The parties have devoted most of their attention to exclusion (m). However, we will address the two exclusions in order because that is how an insured reasonably would approach them, and also because exclusion (k) affects both the property damage and bodily injury (emotional upset) claims.[5]

The language of exclusion (k) pertinent to this case provides that there is no coverage for damage due to "failure of the named insured's products or work completed * * * to perform the function or serve the purpose intended by the named insured, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications".[6] The

[5] Plaintiffs contend that even if exclusion (m) were found to delete coverage for the property damage claims, it does not affect personal injury claims. Therefore, it still would be necessary to address exclusion (k). This is so, say plaintiffs, because the Hardings' suit against plaintiffs was settled and it is not apparent what portion of the settlement was for the property damage claims and what portion was for the personal injury (emotional upset) claim.

[6] The commentators point out that the distinction in exclusion (k) as it read in 1966 was between performance failure or "production" error, for which there was coverage, and "design" error, for which there was no coverage unless damage was due to an *active malfunction.* The language was completely revised in 1973, broadening coverage and removing the production-design error distinction as well as the "active malfunctioning" concept. The 1973 revision reads:

" 'This policy does not apply to loss of use of tangible property which has not been physically injured or destroyed resulting from (1) a delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or (2) the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured; but this exclusion

parties seem to agree that the damages caused by the inadequate drainage system would be excluded under this language. However, exclusion (k) also has an exception, and there is no agreement between the parties as to its effect. The exception reinstates coverage for bodily injury or property damage which results from the *active malfunctioning* of the insured's products or work.

Early commentators suggested that this provision would be difficult to apply. The concept of "active malfunctioning" necessarily implicates the concept of "passive malfunctioning", one author noted. "Having long wrestled with active versus passive *negligence* concepts, we may now enter a new arena of active versus passive *malfunctioning.*" Tarpey, *The New Comprehensive Policy: Some of the Changes,* 33 Ins Counsel J 223, 226 (1966).

Several illustrations were offered in an attempt to clarify the matter. Three widely quoted examples are the insecticide which failed to kill pests (passive) versus the insecticide which killed both pests and crops (active); the hair tonic which failed to prevent loss of hair (passive) versus the hair tonic which caused a skin rash (active); and the rust preventive which failed to stop rust (passive) versus the rust preventive that corroded a radiator (active). *American Employers' Ins Co v Maryland Casualty Co,* 509 F2d 128, 130 (CA 1, 1975).

*American Employers'* itself involved damages caused by the structural weakness of a floor in a municipal building. The Court held that this was

does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured.' " 2 Long, The Law of Liability Insurance, § 11.10, pp 11-57 through 11-58.

due to design and akin to the hair tonic which failed to prevent baldness; therefore, there was no coverage.

Another example from the construction industry involves a structural collapse due to insufficient strength of a steel beam. If the beam used had been purposely selected by the insured, there would be no coverage. However, if the insured had chosen an adequate beam, but workmen put in the wrong one by mistake, there would be coverage. Gowan, *Completed Operations and Products Liability Insurance Coverage of the New Comprehensive General-Automobile Policy,* ABA Section of Insurance, Negligence and Compensation Law Proceedings—1965-1966, p 276.

We do not believe it necessary to engage in this type of semantic sparring. Plaintiffs do not contend that the drainage system installed in this case was other than the one selected; the difficulty was that an inappropriate system had been chosen. Further, "malfunctioning" means functioning badly, not merely not performing as intended or designed. *Id.* There is no indication in the record that the drain tile system in this case "malfunctioned" at all. To the contrary, the system performed as intended by carrying away material. The problem was that sand as well as water entered the system. The damage, therefore, was due to the incompatibility of the drainage system and the abnormal ground condition, but was not caused by the system itself. The "error" was in design, plan or specification, to which exclusion (k) applies. The exception to exclusion (k) cannot reinstate coverage because there was no malfunction, active or otherwise.

We continue our discussion by examining exclusion (m), even though our interpretation of exclu-

sion (k) means that the insured was not protected against the claims in this case under its insurance contract with defendant. We choose to address exclusion (m) because the wording of exclusion (k) was changed radically in 1973 (see fn 6), and also because this Court has not analyzed this provision previously. Provision (m) excludes coverage for damage to "work performed" if the damage is due to "the work or any portion thereof" or "materials, parts or equipment furnished in connection therewith". Exclusion (m) has no exception, and we already have rejected plaintiffs' contention that the provision cannot apply because the exception to exclusion (a) either grants coverage or creates an ambiguity.

There has been much ado about the meaning of the terms "work performed" and "work" in exclusion (m), but a resolution of that debate is not necessary to this case. Whether the terms refer to work under way or completed work, a plain reading of the provision would result in a denial of coverage where damage is caused by the work itself or any materials, parts or equipment used in the project. In other words, this is a classic example of an insurer denying liability when the insured itself is negligent or otherwise responsible for damage to the project. Whether viewed from the perspective of a faulty product or from the perspective of faulty workmanship, the damage in this case which arose from the installation of the inappropriate drainage system would fall outside the scope of plaintiffs' policy. "If exclusion (m) does not apply to the facts before us, it is completely meaningless." *Biebel Brothers, Inc v United States Fidelity & Guaranty Co,* 522 F2d 1207, 1211 (CA 8, 1975).

Plaintiffs have complained that if the implied

warranty situations carved out by the exception to exclusion (a) do not create a grant of coverage, the exception is meaningless. This view fails to recognize that exclusion (m) does not remove coverage when property other than the work product itself is damaged due to problems with the product itself, materials or workmanship. The insured only is required to absorb the cost of *replacement or repair of its own work where the damage arises out of the work.*

"The products hazard and completed operations provisions are not intended to cover damage to the insured's products or work project out of which an accident arises. (Citation omitted.) The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what the coverages in question are designed to protect against. The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained." Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know,* 50 Neb L Rev 415, 441 (1971).

Thus, even if plaintiffs had purchased completed operations and products liability coverage, the "business risk" exclusions would bar protection from the damages the Hardings claimed.[7]

[7] See fn 3.

## IV

In summary, we hold that plaintiffs did not have coverage under the comprehensive general liability insurance policy they purchased from defendant for damages which arose out of a construction effort and which were confined to the building itself. Further, plaintiffs were not insured against bodily injury claims where the damages stemmed from a planning error and were not the result of an active malfunction. In our view, the disputed exclusionary provisions in the insurance contract between plaintiffs and defendant were unambiguous in deleting coverage for occurrences of this sort.

"It is scarcely just either to deprive a purchaser of the protection he is entitled to receive or to extend one type of coverage to fit a completely different situation from that contemplated." 7A Appleman, Insurance Law and Practice, § 4508, p 335.

Reversed and remanded.

COLEMAN and RYAN, JJ., concurred with FITZGERALD, C.J.

KAVANAGH, J. (for affirmance). Although we agree that the insurance policy may reasonably be construed to exclude coverage, we do not agree that such is the only reasonable interpretation. Another reasonable interpretation is set forth by Judge BEASLEY in his opinion for the Court of Appeals, 97 Mich App 584; 296 NW2d 112 (1980). This interpretation affords coverage.

A contract is ambiguous when its words may reasonably be understood in different ways. *Raska v Farm Bureau Mutual Ins Co of Michigan,* 412

Mich 355, 362; 314 NW2d 440 (1982). If, fairly read, the entire contract of insurance leads one to understand that there is coverage under particular circumstances and another fair reading leads to an understanding of no coverage under the same circumstances, the contract is ambiguous and should be construed against its drafter and in favor of coverage. *Id.*

Since we find that this insurance contract yields two conflicting reasonable interpretations, it is ambiguous and we construe it in favor of coverage.

The judgment of the Court of Appeals is affirmed.

WILLIAMS and LEVIN, JJ., concurred with KAVANAGH, J.

The late Justice BLAIR MOODY, JR., took no part in the decision of this case.