John F. O'SHAUGHNESSY, Jr., et al., Respondents,

v.

SMUCKLER CORPORATION, et al., Defendants.

GENERAL CASUALTY COMPANY OF WISCONSIN, Appellant,

v.

SMUCKLER CORPORATION, et al., Respondents.

No. C5–95–1844.

Court of Appeals of Minnesota.

Jan. 30, 1996.

Review Denied March 28, 1996.

Timothy M. O'Brien, Patrick J. O'Connor, William R. Joyce, Faegre & Benson, Minneapolis, for John F. O'Shaughnessy, Jr., et al.

James R. Gray, Gilmore, Aafedt, Forde, Anderson & Gray, Minneapolis, Mark J. Heley, Priti Rashmikant Patel Meagher & Geer, Minneapolis, Keith J. Kerfeld, Tewksbury, Kerfeld & Zimmer, Minneapolis, for Smuckler Corporation, et al.

Peter G. Van Bergen, Andrea E. Reisbord, Cousineau, McGuire & Anderson, Minneapolis, for General Casualty Company of Wisconsin.

A. Patrick Leighton, Leonard W. Glewwe, Moore, Costello & Hart, St. Paul, for Amicus Curiae, Associated General Contractors of Minnesota.

Considered and decided by PARKER, P.J., and SCHUMACHER and DAVIES, JJ.

## OPINION

PARKER, Judge.

General Casualty Company appeals the denial of its summary judgment motion, arguing that the Business Risk Doctrine precludes coverage under its commercial general liability (CGL) policy for damages to a general contractor's work that arise out of the defective work of its subcontractor. The trial court held that new language added to CGL policies in 1986 provides coverage for such damages, thus rendering the Business Risk Doctrine inapplicable to such claims. We affirm.

## FACTS

In 1987, John and Cheryl O'Shaughnessy entered into a professional service contract for the design of a new residence. The following year, they entered into a contract for construction of their home. They paid more than $2 million to have the house designed by Smuckler Architects and built by Smuckler Corporation, a general contractor. The home was actually built by Smuckler Corporation's subcontractors, with Smuckler Corporation performing supervisory and coordination functions.

The O'Shaughnessys alleged there were numerous defects in the design and construction of their new home: the framing subcontractor improperly constructed the house's floor support system, resulting in widespread cracking of the home's gypsum walls and granite marble flooring; the floor trusses were improperly made by the truss fabricator and improperly installed by the framing subcontractor; the exterior brick masonry was improperly constructed, allowing water to leak into the wall system at various locations; and a support column for the back

deck is out of plumb, undermining the structural integrity of the deck. In addition, there are a variety of other problems with the house, including cracked roof tiles, rusted exterior railings, discolored cabinetry, and "excessive settlement of the ground around the residence." The O'Shaughnessys allege that it will cost more than $1 million to repair their home.

In 1994, the O'Shaughnessys commenced an action against the Smuckler Corporation, which had filed for bankruptcy. The bankruptcy court granted the O'Shaughnessys relief from the automatic stay, but limited any recovery by them to the Smuckler Corporation's insurance proceeds.

General Casualty Company subsequently commenced a declaratory judgment action seeking a determination that it is not obligated to provide coverage to either Smuckler Architects or Smuckler Corporation for the cost of repairing or redoing any of Smuckler Corporation's work, or that of its subcontractors, found to be defective. General Casualty moved for summary judgment, arguing that an endorsement to its policy precluded coverage for Smuckler Architects' professional liability. They also argued that claims for the costs of repairing design and construction defects involve a business risk assumed by Smuckler Corporation for which there is no coverage under Minnesota's Business Risk Doctrine. The O'Shaughnessys argued that a 1986 change to the CGL policy makes the Business Risk Doctrine inapplicable in cases where work is performed by subcontractors on behalf of the general contractor.

The trial judge granted General Casualty's motion for summary judgment with respect to Smuckler Architects. The judge, however, denied General Casualty's motion with respect to the Smuckler Corporation, agreeing with the O'Shaugnessys that the 1986 change in the CGL policy meant that the Business Risk Doctrine did not preclude the O'Shaugnessys' claims for damages arising out of the defective work of a subcontractor. There is no appeal by Smuckler Architects.

### ISSUE

Did the trial court err in denying General Casualty's motion for summary judgment in regard to the general contractor, Smuckler Corporation?

### DISCUSSION

■ Ordinarily, the denial of a summary judgment motion is not appealable unless the question presented has been certified to this court as important or doubtful. *McGowan v. Our Savior's Lutheran Church,* 527 N.W.2d 830, 832 (Minn.1995) (citing Min.R.Civ.App.P. 103.03). However, "the Court of Appeals, in the interest of justice, may allow an appeal from an order not otherwise appealable pursuant to Rule 103.03 except an order made during trial." Minn.R.Civ.App.P. 105.01; *see also Emme v. C.O.M.B., Inc.,* 418 N.W.2d 176, 179 (Minn.1988). This court granted discretionary review of the trial judge's order because his ruling involves a legal issue of broad application and because a reversal of the order would obviate further proceedings.

### I.

■ The interpretation of an insurance policy involves a question of law subject to de novo review. *National Family Ins. v. Bunton,* 509 N.W.2d 565, 567 (Minn.App.1993) (citing *Seaway Port Auth. v. Midland Ins. Co.,* 430 N.W.2d 242, 247 (Minn.App.1988)).

> Inasmuch as the language of an insurance policy is that of the insurer, any reasonable doubt as to its meaning must be resolved in favor of the insured, but the court has no right to read an ambiguity into the plain language of an insurance policy in order to construe it against the one who prepared the contract.

*Bobich v. Oja,* 258 Minn. 287, 104 N.W.2d 19, 24 (Minn.1960). Policy language is ambiguous if (1) it is reasonably susceptible to more than one interpretation. *ICC Leasing Corp. v. Midwestern Mach. Co.,* 257 N.W.2d 551, 554 (Minn.1977); (2) the terms used are susceptible to more than one meaning. *Morris v. Weiss,* 414 N.W.2d 485, 487 (Minn.App. 1987) (citing *Columbia Heights Motors, Inc. v. Allstate Ins. Co.,* 275 N.W.2d 32, 34 (Minn. 1979)); or (3) there is an irreconcilable conflict between terms or provisions within the policy. *Rusthoven v. Commercial Standard*

*Ins. Co.,* 387 N.W.2d 642, 644–45 (Minn. 1986).

The burden is on the insurer to establish the applicability of an exclusion. *Caledonia Community Hosp. v. St. Paul Fire & Marine Ins. Co.,* 307 Minn. 352, 354, 239 N.W.2d 768, 770 (1976). "[E]xclusions are to be strictly interpreted against the insurer." *Hennings v. State Farm Fire & Cas. Co.,* 438 N.W.2d 680, 683 (Minn.App. 1989), *review denied* (Minn. June 9, 1989) (citing *Reinsurance Ass'n of Minnesota v. Patch,* 383 N.W.2d 708, 711 (Minn.App. 1986)).

## II.

The Business Risk Doctrine is the expression of a public policy applied to the insurance coverage provided under CGL policies. The policy behind the doctrine provided the rationale for a broad interpretation of a limitation on coverage under the "work performed" exclusion prior to the 1986 change in CGL policies. *See Bor–Son Bldg. Corp. v. Employers Commercial Union Ins. Co. of America,* 323 N.W.2d 58, 61 (Minn. 1982); *Knutson Constr. Co. v. St. Paul Fire & Marine Ins. Co.,* 396 N.W.2d 229, 235 (Minn.1986). The "risk" refers to a contractor's risk that he or she "may be liable to the owner resulting from failure to properly complete the building project itself in a manner so as to not cause damage to it." *Knutson,* 396 N.W.2d at 234. According to *Knutson,*

[t]his risk is one the general contractor effectively controls and one which the insurer does not assume because it has no effective control over those risks and cannot establish predictable and affordable insurance rates.

*Id.* This court has recognized the Business Risk Doctrine as recently as 1994, when it quoted the following definition:

[T]hose risks which management can and should control or reduce to manageable proportions; risks which management cannot effectively avoid because of the nature of the business operations; and risks which relate to the repair or replacement of faulty work or products. These risks are a normal, foreseeable and expected incident of doing business and should be reflected in the price of the product or service rather than as a cost of insurance to be shared by others.

*Sphere Drake Ins. Co. v. Tremco, Inc.,* 513 N.W.2d 473, 477 (Minn.App.1994) (quoting George H. Tinker, *Comprehensive General Liability Insurance–Prospective and Overview,* 25 Fed'n Ins. & Corp. Couns. Q. 217, 224 (1975), *quoted in Knutson,* 396 N.W.2d at 235)).

The rationale behind the Business Risk Doctrine has been articulated as follows:

If insurance proceeds could be used to pay for the repairing and/or replacing of poorly constructed products, a contractor or subcontractor could receive initial payment for its work and then receive subsequent payment from the insurance company to repair and replace it. * * * Equally repugnant on policy grounds is the notion that the presence of insurance obviates the obligation to perform the job initially in a workmanlike manner.

*Knutson,* 396 N.W.2d at 235 (quoting *Centex Homes Corp. v. Prestressed Systems,* 444 So.2d 66, 66–67 (Fla.App.1984)). We note that this rationale is less applicable to a claim by a general contractor for the defective work of its subcontractor. A general contractor has minimal control over the work of its subcontractors by definition, and the fact that the general contractor receives coverage will not relieve the subcontractor of ultimate liability for unworkmanlike or defective work. In such a case, an insurer will have subrogation rights against the subcontractor who performed the defective work. Presumably, the Business Risk Doctrine will preclude the subcontractor from recovering from its own insurer. Thus, the goal of the Business Risk Doctrine would still be achieved because ultimate responsibility for poor workmanship would lie with the one who performed it.

## III.

Under pre–1986 CGL policies, Minnesota's Business Risk Doctrine applied to damage arising out of work performed by subcontractors where the general contractor had exclusive control and responsibility for the work of the subcontractor. *See Knutson,* 396 N.W.2d 229; *Bor–Son,* 323 N.W.2d 58. In *Knutson*

and *Bor–Son,* the Minnesota Supreme Court noted that the basic risk that a commercial general liability policy is intended to cover is the risk that the insured's work will cause bodily injury or damage to property other than the completed work itself:

> It is well established that the purpose of comprehensive liability insurance coverage is to provide protection for personal injury or property damage caused by the product only and not for the replacement or repair of the product.

*Knutson,* 396 N.W.2d at 235 (quoting *Centex,* 444 So.2d at 66).

> The risk intended to be insured is the possibility that the goods, products or work of the insured once relinquished or completed, will cause bodily injury or damage to property other than the completed work itself, and for which the insurer may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what the coverages in question are designed to protect against. The coverage is for tort liability for physical damage to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.

*Bor–Son,* 323 N.W.2d at 63 (quoting Henderson, *Insurance Protection for Products Liability—What Every Lawyer Should Know,* 50 Neb.L.Rev. 415, 441 (1971)).

In *Knutson,* a general contractor subcontracted with independent contractors and suppliers to provide a substantial part of the labor and materials for a building project. Four years after the project was completed, the building owner discovered substantial damages in various parts of the building. Holding that the insurer had no duty to

**1.** The CGL policy defines "property damage" as follows:

defend, the Minnesota Supreme Court stated:

> In some construction projects, the general contractor has overall responsibility in control of the construction of the building. In Bor–Son that exclusive control and responsibility was considered decisive. On other construction projects, the so-called general contractor has something less than overall control of the work of subcontractors. Here, however, as in Bor–Son, Knutson, by contract, undertook to furnish all materials and labor. It had responsibility for all construction work—its own as well as its subcontractors. It had "effective control" over all project work and materials, including those provided by subcontractors. When the completed project is turned over to the owner by the general contractor, all of the work performed and materials furnished by subcontractors merges into the general contractor's product—a product it has contracted to complete in a good workmanlike manner. Thereby it incurred the business risk of liability arising from its failure to fulfill that contractual obligation.

*Knutson,* 396 N.W.2d at 236–37 (citations omitted).

Significantly, however, the *Knutson* court also stated:

> *[A]bsent other considerations,* we reaffirm our holding in *Bor–Son* that the CGL policy does not provide coverage for claims of defective materials and workmanship giving rise to a claim for damage to the property itself which is the subject matter of the construction project.

*Id.* at 235 (emphasis added).

■ It appears that "other considerations" have come into play. Prior to 1986, the products-completed operations hazard did not except work performed by subcontractors. However, the current CGL policy contains the following exclusion and exception to that exclusion:

> 1. "Property damage" to "your work" [1] arising out of it or any part of it and

> a. Physical injury to tangible property, including all resulting loss of use of that property; or

included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

The second paragraph was added in 1986.

Excluded from the policy by the first paragraph is any damage to a general contractor's work, which includes the work of its subcontractors as defined by the policy. The 1986 exception states, however, that the exclusion does not apply if the damaged work or the work out of which the damage arises was performed on "your behalf" by a subcontractor. Thus, the plain language of the exception provides that damage to "your work" is covered if the damage results from the work performed by a subcontractor.

This result is contrary to both *Bor–Son* and *Knutson*, which indicate that the basic risk to be protected against by the CGL policy is the risk of damage to property other than the completed work itself. *Knutson*, 396 N.W.2d at 235; *Bor–Son*, 323 N.W.2d at 63. However, given the nature of exclusion (*l*), which explicitly addresses "'property damage' to 'your work,'" we must conclude that the exception restores coverage to a subcategory of "your work."

General Casualty relies on *Fresard v. Michigan Millers Mut. Ins. Co.*, 414 Mich. 686, 327 N.W.2d 286 (1982), in which the Michigan Supreme Court addressed the meaning of the exclusion at issue, but before the exception to the exclusion was added in 1986. The court said that the exclusion

does not remove coverage when property other than the work product itself is damaged due to problems with the product itself, materials or workmanship. The insured only is required to absorb the cost of replacement or repair of its own work where the damage arises out of the work.

*Id.* 327 N.W.2d at 292. We think it is significant that in arriving at its decision, the court in *Fresard* (decided before the exception to the exclusion was added) specifically noted that at the time of its decision, the exclusion "ha[d] no exception." *Id.* Plainly, that is no longer true.

In *Knutson*, the supreme court held that slight differences in language, such as removal of the words "or on behalf of" in the work-performed exclusion, did not abrogate the Business Risk Doctrine as it applied to that exclusion. *Knutson*, 396 N.W.2d at 237. However,

[t]he deletion of the phrase relating to subcontractors ["or on behalf of"] in the exclusion in the completed operations policy makes sense because the insured contractor has presumably accepted the subcontractor's work as his own * * *.

*Tucker Constr. Co. v. Michigan Mut. Ins. Co.*, 423 So.2d 525 (Fla.App.1982). Here, because of the explicit wording of the exception to exclusion (*l*), we may no longer assume that the work of a subcontractor is subject to this exclusion.

Furthermore, we agree with the trial judge that the difference in language is more than slight. In *Knutson*, the court was faced with an exclusion that omitted the phrase "or on behalf of" when other exclusions in the policy contained that language. Here, we are faced not with an omission, but an affirmative statement on the part of those who drafted the policy language, asserting that the exclusion does not apply to damages arising out of the work of a subcontractor. It would be willful and perverse for this court simply to ignore the exception that has now been added to the exclusion.

We cannot conclude that the exception to exclusion (*l*) has no meaning or effect. The CGL policy already covers damage to the property of others. The exception to the exclusion, which addresses "'property damage' to 'your work,'" must therefore apply to

b. Loss of use of tangible property that is not physically injured.

"Your work" is defined as:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in a. or b. above.

damages to the insured's own work that arise out of the work of a subcontractor. Thus, we conclude that the exception at issue was intended to narrow the Business Risk Doctrine.

We note that this decision does not preclude the Business Risk Doctrine from applying to the repair and replacement costs of defective work itself. We address only its application to "property damage" to "your work," as defined by the policy, which arises out of work performed by the insured's subcontractor. Under our holding and the current language of the policy, the Business Risk Doctrine would still apply to work performed by the general contractor and to other deficiencies in a subcontractor's work that do not constitute "property damage." Absent policy language to the contrary, the Business Risk Doctrine would also preclude a subcontractor from making a claim against its own insurer to recover the cost of repair or replacement of its own defective work. The insurance industry is, of course, free to alter this result in future cases by seeking to change the language of its policies.

Finally, this holding is consistent with industry commentators:

Exclusion (1.), Damage to Your Work, while similar to the "your products" exclusion, differs in two significant respects. First, exclusion (1.) by definition applies only to work within the products-completed operations hazard. Accordingly, exclusion (1.) is not applicable to work in progress. Second, exclusion (1.) does not apply if the damaged work or the work out of which the damage arises was performed on the insured's behalf by a subcontractor. An example of how exclusion (1.) could apply is as follows. The named insured is a general contractor who has built an apartment house with the services of numerous subcontractors. After the building is completed and put to its intended use, a defect in the building's wiring (put in by a subcontractor) causes the building, including work of the general contractor and other subcontractors, to sustain substantial fire damage. The named insured is sued by the building's owner. Although the named insured's policy excludes damage to "your work" arising out of it or any part of it, the second part of exclusion (1) makes it clear that the exclusion does not apply to the claim. That is because the *work out of which the damage arose was performed on the named insured's behalf by a subcontractor.* * * * Thus, barring the application of some other exclusion or adverse policy condition, the loss should be covered, including the part out of which the damage arose.

*Fire, Casualty and Surety Bulletins,* Public Liability, Aa 16–17 (The National Underwriter Co. 1993)) (emphasis added).

The above example involved damages caused by defective workmanship. General Casualty appears to distinguish damage as a result of defective workmanship from "accidental" damage. We see no reason, however, to treat defective wiring that causes a fire any differently from defective structural supports which cause collapsing of portions of a floor and cracking in both the floors and walls of a house. The damage in both cases is real and substantial as well as being the accidental result of defective workmanship.

General Casualty argues that to interpret the policy in this manner would be to transform the policy into a performance bond. We disagree. A variety of deficiencies that do not constitute "property damage" may be covered by a performance bond, and not all deficiencies cause additional property damage. This court's interpretation of General Casualty's policy simply shifts the burden of purchasing a performance bond to the subcontractor where it belongs, since it is the subcontractor who is actually doing the work.

### DECISION

The trial judge's denial of General Casualty's summary judgment motion is affirmed. The case is remanded to proceed in accordance with this opinion.

**Affirmed.**