BYE, Circuit Judge,
dissenting.
The majority holds that the business risk exclusions apply to the additional “completed operations” and “products” coverages purchased by Turbine. Given the particular structure of this policy, I cannot agree. The only insuring agreement, or grant of coverage, that can be found within this policy for those coverages appears in an endorsement — an endorsement that should prevail over the business risk exclusions, not vice versa.
The analytic force of the majority opinion rests on how “completed operations” and “products” coverage is supposed to work, not on how this disputed policy actually 'works. In its rush to interpret the policy as if it were standard, the majority overlooks the plain fact that this policy is unusual. The tragedy is that, in so doing, the majority ignores several bedrock principles of policy interpretation, particularly the rule that coverage endorsements override contrary exclusions in the policy. Thus, I cannot join the majority’s approach and respectfully dissent.
My analysis of this policy leads me to conclude that Reliance failed to attach the “coverage part” form for the optional “completed operations” and “products” coverages that Turbine purchased. As a result, this policy does not set forth, in a straightforward manner, an insuring agreement for those coverages. Nor does the policy exclude from coverage any property damage to the insured’s product or completed work — damages typically excluded under “completed operations” and “products” coverages. Instead, this policy actually triggers coverage for all property damage described in the definitions of “completed operations hazard” and “products hazard.” Those broad definitions encompass the engine damage suffered by Cartillar. I begin by referring to the standard rules of construction followed in Michigan when examining the language of an insurance policy:
(1) The contract should be viewed as a whole;
(2) The intent of the parties should be given effect;
(3) An interpretation of the contract which would render it unreasonable should be avoided;
(4) Meaning should be given to all terms;
(5) Ambiguities should not be forced;
(6) Conflicts among clauses should be harmonized;
(7) The contract should be viewed from the standpoint of the insured; and
(8) The insurer bears the burden of proving an absence of coverage.
See Fresard v. Michigan Millers Mut. Ins. Co., 414 Mich. 686, 327 N.W.2d 286, 288-89 (1982). With these principles in mind, I consider whether this particular policy covers Cartillar’s engine damage.
I start with an examination of the basic policy that Turbine purchased, including the general insuring agreement contained therein; followed by an examination of the pertinent exclusions that limit the general insuring agreement and that might preclude coverage for the engine damage; and finally, conclude with an examination of the endorsements attached to the basic policy that might set forth additional grants of coverage (or exclusions) that might apply to Cartillar’s engine damage.
The general insuring agreement located in the Comprehensive General Liability (CGL) section of the policy provides that “[t]he company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of [] bodily injury or [] property damage to which this insurance applies.” Joint Appendix (JA) 118. The policy further provides that “ ‘Property damage’ means injury to or destruction of tangible property.” JA 113.
*915 If my analysis stopped here, Cartillar’s engine damage would be covered. The engine damage is “injury to or destruction of tangible property,” and thus falls within the policy’s broad definition of “property damage.” Absent an exclusion, Cartillar’s breach of warranty judgment would be covered by the CGL insuring agreement, because the judgment is a sum “which the insured shall become legally obligated to pay.”
I move on to an examination of any pertinent exclusions that might remove Cartillar’s engine damage from the realm of “property damage” to which the insurance applies. Exclusions (Z), (m) and (n), the so-called “business risk” exclusions, do remove Cartillar’s engine damage from the realm of “property damage” covered by the policy. Cartillar’s damage consists solely of property damage to the engines themselves (i.e., Turbine’s product or completed work). The standard business risk exclusions specifically exclude coverage for “property damage to the named insured’s products” and “to work performed by or on behalf of the named insured.” JA 118. Cartillar’s engine damage would not be covered if my analysis ended here.
Knowing, however, that Turbine purchased additional “completed operations” and “products” coverage, as evinced by the declarations page of the policy, I must next examine the endorsements attached to this policy to determine whether any additional insuring agreement restores coverage for Cartillar’s engine damage. It is axiomatic that when an insured pays an additional premium for an endorsement or rider, the insured does so to receive coverage for something that would otherwise be excluded, or that was never originally covered, by the basic policy itself. Cf. Meridian Mut. Ins. Co. v. Morrow, 178 Mich.App. 338, 443 N.W.2d 795, 797-98 (1989) (discussing an endorsement purchased for a specific motorcycle for coverage that would otherwise be excluded under the policy); Porter v. Michigan Mut. Liab. Ins. Co., 293 N.W.2d 799, 284 (1980) (noting that an insured could have purchased an endorsement for an additional premium that would have eliminated certain limitations on the policy’s coverage).
At this point in the analysis, something seems amiss about this particular policy. The policy’s declarations page reflects that Turbine purchased the optional “Coverage Part” for “Completed Operations and Products Liability Insurance” and paid an increased premium for that coverage. See JA 109. The policy’s schedule of coverages/limits of liability also describes certain specific “Completed Operations” and “Products” hazards covered by the policy. See JA 116, 131. In addition, one of the endorsement forms attached to the policy sets forth four separate exclusions (elevator, independent contractor, completed operations, and products) that can be triggered by checking a box next to the applicable exclusion. See JA 121. Here, the endorsement form was used to trigger an elevator exclusion, and that box was checked. Significantly, however, the boxes next to the “completed operations exclusion” and “products exclusion” were not checked — a further indication that Turbine purchased those coverages. See JA 121.
Yet, despite all these indications that Turbine purchased “Completed Operations and Products Liability Insurance,” a search of the entire policy fails to reveal a “coverage part” for that additional coverage. The only provisions that appear to refer to this additional coverage are contained in the definitions section, where the terms “completed operations hazard” and “products hazard” are defined.
When an insured has purchased coverage for the “completed operations” and “products” hazards, I would normally expect the policy to contain a separate “coverage part” that sets forth the terms and provisions of that additional coverage. I base that expectation primarily upon my understanding of the structure utilized in the standard policy forms promulgated by the Insurance Services Offices, Inc., (ISO) and widely used in the insurance industry. The policy considered in National Union *916 Fire Ins. Co. of Pittsburgh v. Structural Sys. Tech., Inc., 756 F.Supp. 1232, 1237-41 (E.D.Mo.), judgment amended, 764 F.Supp. 145 (1991), aff'd, 964 F.2d 759 (8th Cir.1992), exemplifies that structure.
A standard ISO policy typically contains a general insuring agreement in the CGL section of the policy (as does this Reliance policy), providing that the insured “will pay those sums that the insured becomes legally obligated to pay as damages because of ‘bodily injury’ or ‘property damage’ to which this insurance applies .” See, e.g., Structural Systems, 756 F.Supp. at 1237.
The typical policy also contains (as does this Reliance policy) the standard business risk exclusions for property damage to the insured’s product and completed work. See id. at 1238-39.
When an insured purchases the optional coverage for completed operations and products hazard (as Turbine did), a standard ISO policy contains a separate insuring agreement for that additional coverage. See id. at 1241 (“We will pay those sums that the insured becomes legally obligated to pay as damages because of ‘bodily injury’ or ‘property damage’ included within the ‘products-completed operations hazard’ to which this insurance applies.”). Despite the presence of the business risk exclusions in the CGL section of the policy, this separate “completed operations” insuring agreement contains its own exclusions that -specifically apply to property damage to the insured’s product and completed work. See id.
Secondarily, I base my expectation that this Reliance policy should contain a separate “coverage part” for the “completed operations” and “products” hazards upon my examination of this particular contract as a whole — something I am required by Michigan law to do, see Fresard, 327 N.W.2d at 289.
A few examples will explain. The declarations page indicates that Turbine purchased an additional “Coverage Part” for “Hangarkeepers’ Liability Insurance.” See JA 109. Not surprisingly, there is a separate “coverage part” included in the policy that contains a separate “hangar-keepers’ liability” insuring agreement (and separate exclusions) applicable to that additional coverage. See JA 125.
The declarations page also indicates that Turbine purchased two other optional “Coverage Parts” for “Owners’ Landlords’ and Tenants’ Liability Insurance” and “Contractual Liability Insurance.” See JA 109. Not surprisingly, a separate endorsement (Form AV 00 P033 00 1193) applies to those two additional “coverage parts,” and specifically sets forth the corresponding changes made to the CGL section of the policy. See JA 110.
Thus, of the four additional coverages purchased by Turbine, the only one lacking a corresponding “coverage part” in the policy is the one for “Completed Operations and Products Liability Insurance.”
If my analysis stopped at this point, I would conclude that the missing “coverage part” (and therefore the lack of a clearly-set-forth insuring agreement) for “completed operations” and “products” coverages, when coupled with the undisputed fact that Turbine actually purchased those coverages, renders this policy hopelessly ambiguous. Michigan law requires that the policy be viewéd from the standpoint of the insured, and that the insurer bears the burden of proving an absence of coverage. See Fresard, 327 N.W.2d at 289. Reliance charged an increased premium for “completed operations” coverage and listed “T45 Conversions” (the completed work at issue) as the “operations” covered by the policy. See JA 116. Yet the absence of a “coverage part” in the policy, explaining what exactly that additional coverage encompasses, leaves me unable to locate any unambiguous provision excluding coverage for the engine damage at issue. Under those circumstances, and in view of the insurer’s burden, I would be constrained by Michigan law to interpret the policy in a manner favoring coverage.
A Louisiana court faced a nearly identical situation. See Mike Hooks, Inc. v. *917 JACO Services, Inc., 674 So.2d 1125 (La.Ct.App.1996). There (as here) the insurer acknowledged that the insured had purchased “completed operations” coverage, but the policy contained only a general insuring agreement (to which applied a standard business risk exclusion for damage to the insured’s completed work), with no separate provisions regarding the “completed operations” coverage other than those contained in the definitions. See Mike Hooks, 674 So.2d at 1126-27. The court concluded that the “missing” provisions for the “products-completed operations hazard” rendered the policy ambiguous, and construed the policy in favor of coverage.
We are unable to find an unambiguous provision in this policy addressing what the products-completed operations coverage, as found on the declarations page, encompasses. As such, we find that the portions of the policy covering products-completed operations to be ambiguous. Therefore, we are constrained to interpret these terms in a light favoring coverage.
Id. at 1127; accord Kidd v. Logan M. Killen, Inc., 640 So.2d 616, 620-22 (La.Ct.App.1994) (superseded by statute on other grounds); Gaylord Chem. Corp. v. ProPump, Inc., 753 So.2d 349, 356-57 (La.Ct. App.2000); but see Hawkeye-Security Ins. Co. v. Davis, 6 S.W.3d 419, 425 n. 4 (Mo.Ct.App.1999) (acknowledging the force of the Louisiana cases, but choosing to ignore them to the extent that they could not be distinguished).
My analysis of the Reliance policy must not stop with the discovery of the missing “coverage part,” however. Michigan law requires us to give meaning to all terms within the policy, if possible. See Fresard, 327 N.W.2d at 289. An examination of the entire policy reveals that meaning can be given to the additional “completed operations” and “products” coverages purchased by Turbine, despite Reliance’s failure to attach the proper “coverage part.”
As previously noted, the policy’s schedule of coverages/limits of liability (Form 38/39) describes certain specific “Completed Operations” and “Products” hazards covered by the policy. See JA 116. “T45 Conversions” are specifically listed in the hazard schedule under hazard (d) for “Completed Operations.” See JA 116.
A second endorsement (Form 42) refers to the hazard schedule in the first endorsement, and provides, in pertinent part, that
[t]his insurance does not apply to damages because of bodily injury or property damage included within the completed operations hazard or included within the products hazard unless the operations or products are described in the schedule under hazards (d) and (e)— Completed Operations or Products.
JA 122 (emphasis in original).
By necessary implication, this second endorsement provides that the policy does apply to property damage included within the completed operations hazard or products hazard if the operations or products are described in the schedule under hazards (d) or (e). “T45 Conversions” are indeed listed under hazard (d) in the schedule.
These two endorsements, read together, contain an insuring agreement for the additional “completed operations” and “products” coverages purchased by Turbine. My careful analysis of the entire policy satisfies me that these are the only provisions within this policy that can possibly be construed as the insuring agreement for those additional coverages.
Thus, having finally identified an insuring agreement for the “completed operations” and “products” coverages, I continue my analysis. Endorsement Form 42 refers to “completed operations hazard” and “products hazard” in bold letters, meaning those terms are defined elsewhere in the policy. I therefore proceed to the definitions of those terms to determine the scope of the “property damage” included within them.
The definition of “Completed operations hazard” provides that
*918 “[C]ompleted operations hazard” includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured. “Operations” include materials, parts, or equipment furnished in connection therewith.
JA 112.
The definition of “Products hazard” in the policy provides that
“[Pjroducts hazard” includes bodily injury and property damage arising out of the named insured’s products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others.
JA 113.
These definitions of “completed operations hazard” and “products hazard” compel the conclusion that this policy covers Cartillar’s engine damage. In this policy, Endorsement Form 42 gives life to the entire definitions of “completed operations hazard” and “products hazard” as a grant of coverage. The only limitations placed on that coverage are those already contained within the definition of “completed operations hazard,” which provides that
The completed operations hazard does not include bodily injury or property damage arising out of
(a) operations in connection with the transportation of property, unless the bodily injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,
(b) the existence of tools, uninstalled equipment or abandoned or unused materials, or
(c) operations for which the classification stated in the policy or in the company’s manual specifies “including completed operations.”
JA 112. Although property damage arising out of certain operations is specifically excluded by this definition, conspicuously absent is any exclusion for property damage to the insured’s products or completed work.
Furthermore, the “property damage” covered by the policy includes all “injury to or destruction of tangible property.” “Destruction of tangible property” can “arise out of operations” or “reliance upon a representation or warranty” with respect to both (1) damages to the product or completed work itself, and (2) damages to other property. Thus, the broad grant of coverage in this policy necessarily encompasses the engine damage at issue.
I acknowledge that many cases and secondary authorities have addressed the typical scope and limits of “completed operations” and “products” coverages. Those authorities indicate that
[t]he products hazard and completed operations provisions are not intended to cover damage to the insured’s products or work project out of which an accident arises. The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable.
Henderson, Insurance Protection for Products Liability and Completed Operations — What Every Lawyer Should Know, 50 Neb. L.Rev. 414, 441 (1971) (citation omitted) (emphasis added); see also Fresard, 327 N.W.2d at 292 (citing the above law review article for the proposition that “completed operations” coverage is not intended to cover damages to the insured’s products or completed work). But that reasoning does not apply here, because this policy is atypical.
*919 .As I discussed above, when an insurer grants additional coverage for all bodily injury and property damage included within the definitions of “completed operations hazard” and “products hazard,” the insurer typically re-excludes (if you will) coverage for damage to the insured’s product and completed work. See, e.g., Structural Systems, 756 F.Supp. at 1239, 1241. Typical “completed operations” coverage requires separate damage-to-the-product and damage-to-the-work exclusions precisely because the additional grant of coverage would otherwise encompass damage to the insured’s product and completed work.
The Reliance policy contains no separate damage-to-the-product and damage-to-the-work exclusions applicable to the additional coverage. Undoubtedly, those separate exclusions would have been contained in the “coverage part” that Reliance failed to attach to this policy. The policy that Reliance actually issued is the only one with which the court can be concerned, however, and any exclusions that appear in that policy must be strictly construed against the insurer. See Farm Bureau Mut. Ins. Co. of Michigan v. Moore, 190 Mich.App. 115, 475 N.W.2d 375, 377 (1991).
The majority holds that the additional “completed operations” and “products” coverages are subject to the business risk exclusions in the CGL section of the policy. Given the particular nature and structure of this policy, that holding is unsound. In this policy, the only grant of coverage for “completed operations” and “products” insurance is located within an endorsement. The broad grant of coverage in that endorsement conflicts with the business risk exclusions to the extent that the endorsement provides coverage for all property damage included within the definitions of “completed operations hazard” and “products hazard.” “When a conflict arises between the terms of an endorsement and the form provisions of an insurance contract, the terms of the endorsement prevail.” Hawkeye-Security Ins. Co. v. Vector Constr. Co., 185 Mich.App. 369, 460 N.W.2d 329, 334 (1990) (citing Peterson v. Zurich Ins. Co., 57 Mich.App. 385, 225 N.W.2d 776, 779 (1975)). Under this universally accepted rule of construction, the business risk exclusions in this policy should and must be viewed as subject to the endorsement, not vice versa.
The fact that Endorsement Form 42 merely incorporated definitions already found within the form provisions of the policy does not change my conclusion. The form definitions, incorporated into the endorsement, still prevail over the inconsistent business risk exclusions. Two Michigan cases support my conclusion.
In Jones v. Philip Atkins Const. Co., 143 Mich.App. 150, 371 N.W.2d 508 (1985) and Tiano v. Aetna Cas. & Sur. Co., 102 Mich.App. 177, 301 N.W.2d 476 (1980), the Michigan Court of Appeals addressed insurance policies with definitions of “completed operations hazard” and “products hazard” identical to the form definitions at issue in this particular policy. In those cases, however, the form definitions were incorporated into exclusion endorsements, rather than coverage endorsements. See Jones, 371 N.W.2d at 510-11; Tiano, 301 N.W.2d at 478-79.
Both Jones and Tiano held that the form definitions of “completed operations hazard” and “products hazard,” when incorporated into an endorsement, prevailed over inconsistent form provisions in the policy. See Jones, 371 N.W.2d at 512 (“The completed operations exclusion appears on a separate endorsement. This Court has previously held that endorsements or riders prevail over form provisions of a contract”); Tiano, 301 N.W.2d at 480 (“If the language of an endorsement and the general provisions of the policy conflict, the endorsement will prevail, and the policy remains in effect as altered by the endorsement”).
An endorsement overrides inconsistent form provisions in the policy whether it grants, or excludes, coverage. Even though the coverage endorsement in this policy merely incorporated definitions of “completed operations hazard” and “products hazard” from within the policy itself, *920 the resulting grant of coverage is not subject to the business risk exclusions.
The flaw in the majority’s reasoning is its failure to identify an insuring agreement for Turbine’s “Completed Operations and Products Liability Insurance.” The majority refers only to the policy’s definitions of “completed operations hazard” and “products hazard” when discussing this issue, implying that those definitions comprise the additional “coverage part.” It is axiomatic, however, that a definition, standing alone, cannot constitute an insuring agreement. See, e.g., Hawkeye-Security Ins. Co. v. Davis, 6 S.W.3d at 423. If the additional grant of coverage for “completed operations” and “products” insurance is not within Endorsement Form 42, the endorsement I have identified, then the insuring agreement for those additional coverages appears nowhere within this policy.
The majority and I may disagree about whether or not a “coverage part” is missing from this policy, but I do not believe that the majority may side with Reliance in that dispute. Michigan law requires us to resolve ambiguities in favor of the insured, not the insurer.
For the above reasons, I dissent.