**HAWKEYE–SECURITY INSURANCE COMPANY, Plaintiff– Respondent,**

v.

**John DAVIS, d/b/a Davis Construction, Defendant, and Thomas T. McGuinness and Marianne McGuinness, Defendants–Appellants.**

No. 22705.

Missouri Court of Appeals, Southern District, Division One.

Oct. 28, 1999.

Motion for Rehearing and Transfer Denied Nov. 12, 1999.

Application to Transfer Denied Dec. 21, 1999.

---

Richard L. Schnake, Neale & Newman, L.L.P., Dale L. Davis and Robert D. Lewis, Crouch, Davis, Lewis & Rykowski, Springfield, for appellants.

Arlen L. Tanner, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Kansas City, for respondent.

KENNETH W. SHRUM, Judge.

Hawkeye–Security Insurance Company ("Hawkeye") brought this declaratory judgment action to determine whether a commercial general liability insurance policy it issued to John Davis ("Davis"), a general contractor, covered a claim for damages made by Thomas and Marianne McGuinness ("Appellants") against Davis. Appellants' claim arose because Davis failed to build their house in a workmanlike manner and in accordance with their contract. Hawkeye and Appellants each filed motions for summary judgment. The trial court found that Hawkeye's policy did not cover Appellants' damages and entered summary judgment for Hawkeye. This appeal followed. We affirm.

Hawkeye insured Davis under a standard form liability policy having effective dates of July 30, 1994, to July 30, 1995. The declarations page describes the contract as a "Commercial General Liability Policy." Among other provisions, the declarations page provides:

"IN RETURN FOR THE PAYMENT OF THE RENEWAL PREMIUM AND SUBJECT TO ALL THE TERMS OF THE POLICY, INCLUDING FORMS AND ENDORSEMENTS LISTED BELOW, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS RENEWAL CERTIFICATE FOR THE RENEWAL PERIOD SHOWN ABOVE.

"LIMITS OF INSURANCE

| | |
|---|---|
| "GENERAL AGGREGATE LIMIT (OTHER THAN PRODUCTS/COMPL OP) | $1000,000 |
| "PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT | $1000,000 |

. . . .

| *"COVERAGES   PROVIDEDD* | *PREMIUM* |
|---|---|
| "PRODUCTS/COMPLETED OPERATIONS | $1,110 .00 |
| "OTHER THAN PRODUCTS/COMPLETED OPERATIONS | *$2,320 .00* |
| "TOTAL ESTIMATED RENEWAL PREMIUM | $3,430 .00" |

In 1994, Davis contracted to build a house for Appellants. Davis hired subcontractors to perform most of the work. The contract specifically provided that Davis would be liable for any acts or omissions of the subcontractors. Davis also warranted that all of the work on the house would be of good quality and free from fault and defects.

When the house neared completion, Appellants discovered defects in the house, both in materials and workmanship, that "arose out of the work or operations" of Davis's subcontractors. On February 10, 1995, Davis "walked off and abandoned" the job site because of a dispute with Appellants about contract payment. At that point, Davis's work under the contract was substantially complete. All that remained to be done was a final walkthrough and punch list, plus any work required to correct, repair, or replace inferior materials or remedy defective construction.

On October 4, 1996, Appellants sued Davis for damages, claiming that between September 1994 and February 10, 1995— which was within the policy period— Davis's subcontractors performed faulty work and used inferior materials in the house. Appellants' suit was for breach of contract (Count I) and breach of express and implied warranties (Counts II and III).

Hawkeye hired defense lawyers for Davis but did so under a reservation of

rights. Later, Davis rejected Hawkeye's tendered defense because of its conditional nature. In January 1998, Appellants obtained a judgment against Davis for $422,210.

In July 1997, Hawkeye brought this action seeking a declaration that its Commercial General Liability ("CGL") policy did not insure Davis against Appellants' claims. The trial court agreed with Hawkeye and found, *inter alia:*

> "[Appellants] ... adroitly argue[ ] that because of the separate limits and separate premiums shown, there must be a separate policy for products-completed hazard coverage.
>
> . . . .
>
> "The products-completed hazard coverage is not a separate policy but a subpart of the entire Commercial General Liability policy.
>
> . . . .
>
> "There is no language contained in the policy which provides coverage for the business risks of defective construction or breach of contract or breach of warranty.
>
> . . . .
>
> "The CGL policy contemplates coverage for injury to a person or property other than the property ... upon which Davis and his subcontractors worked [for Appellants].
>
> . . . .
>
> "The Court finds that [Appellants] have failed to set forth policy language that establishes insurance coverage under the uncontroverted facts and the policy language."

The court adjudged that "no coverage exists under the insurance policy in question for the allegations of [Appellants] and further that various policy exclusions would further operate to limit or defeat coverage."

■ In their sole point relied on, Appellants contend the trial court erred in finding that Hawkeye's CGL policy did not cover Davis for their damages and in sustaining Hawkeye's motion for summary judgment. Appellants point to the policy's declarations as clear evidence that Davis bought and paid for two distinct types of coverage, i.e., "PRODUCTS/COMPLETED OPERATIONS" and "OTHER THAN PRODUCTS/COMPLETED OPERATIONS." Continuing, they assert that the policy contains only one coverage form, specifically a "COMMERCIAL GENERAL LIABILITY COVERAGE FORM." Based on this premise, Appellants make a two-pronged argument that Davis is covered for their loss.

In the first prong of their argument, Appellants contend that despite the absence of a "PRODUCTS/COMPLETED OPERATIONS" coverage form in Davis's policy, the policy provides "insight" into the meaning of "PRODUCTS/COMPLETED OPERATIONS" coverage in that the policy defines the term "Products-completed operations *hazard."* That definition, found in the "COMMERCIAL GENERAL LIABILITY COVERAGE FORM," provides:

> "11.a. 'Products-completed operations hazard' includes all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' except:
>
> "(1) Products that are still in your physical possession; or
>
> "(2) Work that has not yet been completed or abandoned.
>
> "b. 'Your work' will be deemed completed at the earliest of the following times:
>
> "(1) When all of the work called for in your contract has been completed.
>
> "(2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.
>
> "(3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contrac-

tor or subcontractor working on the same project.

"Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."

Appellants correctly point out that "the *definition* of 'Products-completed operations hazard' is not in itself an insuring agreement" and is not part of the "Insuring Agreement" appearing at the outset of the "Coverages" section of the CGL Coverage Form.[1] According to Appellants, the "Products-completed operations hazard" definition merely establishes the meaning of that phrase as it is used elsewhere in the basic CGL policy. Continuing, Appellants argue that the definition of "Products-completed operations hazard" is not exhaustive and should not be interpreted as describing all damage that might fall under the "PRODUCTS/COMPLETED OPERATIONS" coverage. They argue:

> "The definition merely says that the products-completed operations hazard '*includes*' certain things. In common parlance, to 'include' means 'to take in or comprise as a part of a larger aggregate or principle.' WEBSTER'S NEW COLLEGIATE DICTIONARY 576 (1981). Thus, a definition that 'includes' certain things does not exclude others. *Lynch v. Gleaner Combine Harvester Corp.*, 223 Mo.App. 196, 17 S.W.2d 554, 556 (1929)."

Based on the foregoing, Appellants assert that the definition of "Products-completed operations hazard" encompasses the damage to their house and compels a finding that Hawkeye is contractually obligated to cover Davis for the faulty work and materials he and his subcontractors used in Appellants' house. Appellants' argument continues as follows:

First, they point to uncontradicted evidence that Davis did not own the land but, instead, built the house on land owned by Appellants. Consequently, they argue the damage occurred "away from premises that [Davis] own[ed] or rent[ed]."

Second, they say there is no dispute that Appellants' damages were caused by "your [Davis's] work." They then point to undisputed evidence that (a) Davis warranted that all of the work on the house would be of good quality and would be free from faults and defects; (b) the policy defines "your work" to include work or operations "performed by [Davis] or on [Davis's] behalf" and "[m]aterials, parts or equipment furnished in connection with such work or operations;" and (c) the policy further defines "your work" to include "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use" of the work.

Third, they aver the undisputed evidence showed that Davis both "completed" and "abandoned" the project. All that remained to be done was "a walk-through and punch list" and "work that needed correction, repair, or replacement."[2]

Based on the foregoing, Appellants say that the definition of "Products-completed operations hazard" in Hawkeye's CGL Coverage Form "suggests" that Hawk-

---

1. The pertinent part of the insuring agreement in the CGL Coverage Form provides:

   "**1. Insuring Agreement.**
   "a. We will pay those sums that the insured becomes legally obligated to pay as damages because of ... 'property damage' to which this insurance applies.... But:
   "(1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III);
   ....
   "No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUP-

   PLEMENTARY PAYMENTS—COVERAGES A AND B.
   "b. This insurance applies to ... 'property damage' only if:
   "(1) The ... 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory;' and
   "(2) The 'bodily injury' or 'property damage' occurs during the policy period."

2. Under the policy, work "that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."

eye's "PRODUCTS/COMPLETED OPERATIONS" coverage insures Davis for their damage.

In the second prong of their argument, Appellants contend that charging Davis for "PRODUCTS/COMPLETED OPERATIONS" and then omitting a "coverage part" for that risk is "duplicitous in the truest sense of the word." Consequently, they argue, the policy is ambiguous and the ambiguity must be resolved in favor of coverage. *See, e.g., Peters v. Employers Mut. Cas. Co.*, 853 S.W.2d 300, 302 (Mo. banc 1993); *Behr v. Blue Cross Hosp. Serv., Inc.*, 715 S.W.2d 251, 256 (Mo.banc 1986); *Killian v. Tharp*, 919 S.W.2d 19, 21[5] (Mo.App.1996).

■ We address Appellants' arguments with the following principles in mind. Language in a comprehensive liability policy, as with any other contract, must be given its plain meaning without unduly straining the language. *Rice v. Fire Ins. Exch.*, 946 S.W.2d 40, 42[1] (Mo. App.1997); *Luyties Pharmacal Co. v. Frederic Co., Inc.*, 716 S.W.2d 831, 834[7] (Mo.App.1986). If an insurance policy is unambiguous, it will be enforced according to its terms, but if it is ambiguous, it will be construed against the insurer. *American States Ins. Co. v. Broeckelman*, 957 S.W.2d 461, 465[3] (Mo.App.1997). If the policy language is ambiguous (if there is duplicity, indistinctness, or uncertainty in its meaning) and is therefore open to different constructions, it will be interpreted in the manner that would ordinarily be understood by the lay person who bought and paid for the policy. *Id.* at 465[5]. Even so, courts are not authorized to exercise inventive powers to create an ambiguity where none exists. *Luyties Pharmacal*, 716 S.W.2d at 835.

■ Appellants' arguments, though innovative, are unavailing for several reasons. First, the basic premise upon which Appellants rely, i.e., that Hawkeye's policy was missing a coverage part for "PROD-

UCTS/COMPLETED OPERATIONS," is fallacious. The "Insuring Agreement" in the CGL Form used in this policy obligates Hawkeye to "pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' *to which this insurance applies.*"[3] (Emphasis added.) Standing alone, this does not explain the scope of the CGL Form coverage. When interpreting an insurance policy, however, we consider the entire policy and not isolated provisions or clauses. *Rice*, 946 S.W.2d at 42[3]. The "Insuring Agreement" in this CGL Coverage Form directs us to other provisions of the policy when it states, "[t]he amount [Hawkeye] will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III)." In relevant part, the "SECTION III–LIMITS OF INSURANCE" provides:

"1.  The Limits of Insurance shown in the Declarations . . . fix the most we will pay regardless of the number of:

"a.  Insureds;

"b.  Claims made or 'suits' brought; or

"c.  Persons or organizations making claims or bringing 'suits.' "

"2.  The General Aggregate Limit is the most we will pay for the sum of:

. . . .

"b.  Damages under Coverage A, except damages because of 'bodily injury' or 'property damage' included in the 'products-completed operations hazard;' and

"c.  Damages under Coverage B.

"3.  The Products–Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of 'bodily injury' and 'property damage' included in the 'products-completed operations hazard.' "

When we read the phrase " 'property damage' *to which this insurance applies,*" con-

---

**3.**  Refer to note 1 for relevant excerpts of the insuring agreement.

tained in the CGL Form's insuring agreement, together with the declarations page and the CGL Form provisions quoted above, we find it plain that the CGL Form coverage agreement applies to both "PRODUCTS/COMPLETED OPERATIONS" coverage *and* "OTHER THAN PRODUCTS/COMPLETED OPERATIONS" coverage. Without "unduly straining" the policy's language, we read the "products-completed operations hazard" as describing a coverage within the CGL Form for the same types of injuries or damages covered by the rest of the CGL policy but *for a different period of time or location.* Accordingly, the trial court did not err when it concluded that "[t]he products-completed hazard coverage is not a separate policy but a sub-part of the entire Commercial General Liability policy." Because the policy is not missing a coverage part as urged by Appellants, the policy cannot be condemned as ambiguous on the theory that it promised something at one point but took it away at another. *See, e.g., Northland Ins. Cos. v. Russo,* 929 S.W.2d 930, 933–34 (Mo.App. 1996); *Husch v. Nationwide Mut. Fire Ins. Co.,* 772 S.W.2d 692, 694 (Mo.App. 1989). We reject Appellants' arguments to the contrary.[4]

Having found that Appellants' arguments about a "missing" coverage part are unavailing, we examine the policy to see if the trial court otherwise erred when it found no coverage for Appellants' losses. The policy covers property damage caused by an "occurrence" that takes place in the coverage territory and occurs during the policy period. *See* note 1. The policy defines the term "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Although not defined by the policy, the term "accident" as used in a CGL policy is defined by its common meaning, which is:

> " 'An event that takes place without one's foresight or expectation; an undesigned, sudden and unexpected event. Hence, often, an undesigned and unforeseen occurrence of an afflictive or unfortunate character; a mishap resulting in injury to a person or damage to a thing; a casualty; as to die by an accident.' "

*American States Ins. Co. v. Mathis,* 974 S.W.2d 647, 650[7] (Mo.App.1998) (citations omitted).

Evidence of what Appellants claim as an "occurrence" and "property damage" is found in the transcript of Appellants' case against Davis[5] and in their response to Hawkeye's motion for summary judgment. At the trial of Appellants' case against Davis, Thomas T. McGuinness testified:

"Q. Now, following that initial agreement and during the period—Well, did there come a time in February ... 1995 that Mr. Davis, the defendant, abandoned the job site, walked off the job site?

"A. That's correct.

"Q. And was that on or about February the 10th [1995]?

"A. That's correct.

. . . .

"Q. Mr. McGuinness, are you and your wife ... claiming that property damage occurred to your house that occurred during construction was started, to February 10, 1995?

**4.** Appellants cite *Kidd v. Logan M. Killen, Inc.,* 640 So.2d 616 (La.App.1994), and *Mike Hooks, Inc. v. JACO Services, Inc.,* 674 So.2d 1125 (La.App.1996), for the proposition that Hawkeye's alleged omission of a products/completed operations coverage form created an ambiguity that must be resolved against Hawkeye. However, we read this policy differently than did the Louisiana courts in that we find no omission of a products/completed operations coverage form. The

Louisiana decisions, which did declare that the CGL policies at issue lacked provisions regarding "products/completed operations" and thus were ambiguous, are not binding on this court. To the extent that they cannot be distinguished, we choose not to follow them.

**5.** Hawkeye made that transcript a part of its motion for summary judgment by attaching it to the motion and citing it.

"A. Yes.

"Q. And that this property damage during this period of time was a result of defective work performed by the subcontractors hired by Mr. Davis?

"A. Yes."

In answering Hawkeye's summary judgment motion, Appellants conceded the following as "uncontroverted facts."

"9. [Appellants] claim that between September ... 1994 and February 10, 1995 the house was defectively constructed and/or inferior materials were used by the subcontractors acting on Davis' behalf.

"10. [Appellants'] claim against ... Davis was for the cost to replace or repair the structural defects of the house and extensive repair or replacement and correction of other defects due to the work and operations performed by the subcontractors."

"11. The defects alleged arose out of the work or operations performed by ... Davis' subcontractors and the material they furnished in connection with the work and operations of building the house."

These uncontroverted facts establish that Appellants' losses stem *solely* from Davis's breach of his contractual obligations, breach of his express warranties, or breach of implied warranties in connection with this construction. However, "breach of a defined contractual duty cannot fall within the term 'accident.'" *Mathis*, 974 S.W.2d at 650. As the *Mathis* court explained: "Performance of [the] contract according to the terms specified therein was within [the insured contractor's] control and management and its failure to perform cannot be described as an undesigned or unexpected event." *Id.*

We are persuaded that the Mathis analysis applies here. Davis had sufficient control and management to enable him to fulfill his contractual obligations and build the house for Appellants as warranted. Davis's failure to perform cannot be char-acterized as "an undesigned or unexpected event." Consequently, Appellants cannot show that there was an "occurrence" within the meaning of the policy. See *Mathis*, 974 S.W.2d at 650. Without an "occurrence" as defined in the policy, Davis is not covered for Appellants' losses. The trial court did not err in so finding.

■ Moreover, even if "defective construction and/or inferior material" usage were viewed as causing "property damage" within the meaning of the policy—a notion we reject—Appellants' evidence was that such property damage occurred during the construction period, i.e., before Davis abandoned the property. Accordingly, the "products-completed operations" coverage would not be implicated. Instead, any coverage would come via the "other than products/completed operations" part of the policy. However, exclusionary provisions of the policy cut off Hawkeye's liability for Appellants' losses under the circumstances here. For instance, the policy provided:

"2.... This insurance does not apply to:

. . . .

"j. 'Property damage' to:

. . . .

"(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations.

"(6) That particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."

These provisions defeat any coverage that would arguably be available under the "other than products/completed operations" part of the policy. Again, the trial court did not err in so declaring.

■ Finally, we have not ignored Appellants' claim that Hawkeye's policy was rendered ambiguous by exclusionary language in SECTION I, Coverage A, paragraph

2(*l*) of the CGL Coverage Form. That provision reads:

> "2. Exclusions. This insurance does not apply to:
>
> . . . .
>
> "(*l*) 'Property damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'
>
> "This exclusion does not apply if the *damaged work* or the work out of which the damage arises was performed on your behalf by a subcontractor."

After pointing out that virtually all the work done on Appellants' house was performed by subcontractors, Appellants argue:

> "[T]he italicized portion of the exception to this exclusion refers to the 'damaged work' itself as well as to the 'work out of which the damage arises.' Thus, the exception applies if the damage arises out of the work itself and if the 'damaged work ... was performed on your behalf by a subcontractor.' That, plainly and simply, is defective subcontractor work. It is wholly inconsistent, then, for the policy also to require an 'occurrence' or an 'accident' as a condition of coverage for such defective work. That creates yet another ambiguity."

■ "An exclusion provision in an insurance policy, by definition, excludes risk." *Harold S. Schwartz & Assoc., Inc. v. Continental Cas. Co.,* 705 S.W.2d 494, 498 (Mo.App.1985). Stated otherwise, an exclusion is a policy provision which declares that certain causes of loss, or certain consequences of an insured event are not covered by the policy. *Millers Mut. Ins. Ass'n v. Shell Oil Co.,* 959 S.W.2d 864, 865, n. 1 (Mo.App.1997).

■ Except for public policy or statutory constraints, an insurer can cut off liability under its policy by using clear language, but it cannot do so with language dulled by ambiguity. *Aetna Cas. & Sur. Co. v. Haas,* 422 S.W.2d 316, 321[5] (Mo.Sup.1968). However, when an exclusion is not relevant under the facts at hand, an alleged ambiguity therein is also irrelevant. *See Empire Fire and Marine Ins. Co. v. Dust,* 932 S.W.2d 416, 418 (Mo. App.1996). This follows, at least in part, because an exclusion provision has no function to endow coverage but serves only to limit the obligation of indemnity undertaken by the policy. *Id.; Harold S. Schwartz & Assoc.* 705 S.W.2d at 498[6].

Here, Appellants urge us to analyze and find ambiguity in the policy because of exclusion 2(*l*), and, as a consequence, declare there is coverage for their losses. They apparently would have us do this without first considering whether there was an insured event, i.e., an obligation of indemnity undertaken by the policy for this type problem. The foregoing cases teach that such an analysis would be flawed. We have already determined that the evidence before us does not satisfy Appellants' burden of showing an "occurrence" within the meaning of the policy; consequently, Hawkeye need not invoke the paragraph 2(*l*) exclusion to relieve itself of its insuring agreement.[6] Under the circumstances, it is unnecessary to decide whether the exclusion in paragraph 2(*l*) is without ambiguity, or whether, as Appellants contend, the exclusion is ambiguous and is, therefore, subject to resolution in favor of coverage. *See Dust,* 932 S.W.2d at 418. Accordingly, any discussion of this argument would be merely advisory. "Appellate courts do not render advisory opinions or decide nonexistent issues." *In re Estate of Looney,* 975 S.W.2d 508, 519[29] (Mo.App.1998). *See also Air Evac EMS, Inc. v. Goodman,* 883 S.W.2d 71, 74[3] (Mo.App.1994); *In re Marriage of DuBois,* 875 S.W.2d 223, 226[2] (Mo.App.1994). For this reason, we refrain from addressing this issue. Point denied.

The judgment of the trial court is affirmed.

---

**6.** Again, refer to note 1 for relevant excerpts of the insuring agreement.

CROW, P.J., CONCURS.

PARRISH, J., CONCURS.