# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3631
No. 99-3632

_____

Reliance National Insurance Company,   *
                                               *

     Plaintiff - Appellee,            *
                                               *

     v.                               *   Appeals from the United States
                                               *   District Court for the

William Hatfield; Nancy Hatfield;   *   Eastern District of Arkansas.
Turbine Conversions, Ltd.; J. R.     *
Cartillar, doing business as        *
Cartillar Flying Service,          *
                                               *

     Defendants - Appellants,     *

_____

Submitted:  May 8, 2000

Filed:   October 10, 2000

_____

Before BOWMAN, LOKEN and BYE, Circuit Judges.

_____

LOKEN, Circuit Judge.

Turbine Conversions, Ltd., of Nunica, Michigan ("Turbine"), sold two PT6 Pratt & Whitney turbine engines and two T45 conversion kits to Cartillar Flying Service of Hickory Ridge, Arkansas ("Cartillar"). Turbine completed the conversions, which entailed installing the turbine engines in Cartillar's agricultural aircraft, and returned the converted airplanes to Cartillar in Arkansas. Shortly thereafter, the converted

engines suffered catastrophic failures. Cartillar sued Turbine for breach of warranty and recovered a substantial judgment for damages to the engines. In this separate action by Turbine's insurer, Reliance National Insurance Company seeks a declaratory judgment that its liability policy for the applicable period did not cover those damages. The district court[1] granted judgment in favor of Reliance, concluding that business risk exclusions in the policy preclude coverage for damage to the products Turbine sold to Cartillar. Turbine, Cartillar, and their owners appeal. The parties agree that Michigan law governs the coverage issue. Construing the insurance policy and Michigan law *de novo*, see St. Paul Fire & Marine Ins. Co. v. Missouri United Sch. Ins. Council, 98 F.3d 343, 345 (8th Cir. 1996) (standard of review), we affirm.

The Reliance policy was a comprehensive general liability ("CGL") policy tailored to Turbine's aircraft- and airport-related business. As the policy name suggests, the CGL form of policy is used to offer insureds a buffet of standard business liability coverages. Each insured selects the types and amounts of coverage that are suitable to its business. These coverages are recorded on the policy's declarations page. Other policy terms and conditions, such as coverage definitions, conditions, and exclusions, appear in standard printed policy documents that accompany the declarations page. Although each insurer is free to formulate its own CGL policy, this policy structure has been developed by a nationwide industry service organization and is very widely (if not universally) employed. See generally Fresard v. Michigan Millers Mut. Ins. Co., 327 N.W.2d 286, 287-88 (Mich. 1982).

The Reliance policy stated that it covered bodily injury and property damage to which this insurance applies. It is undisputed that Cartillar's engine damage falls within the policy's definition of property damage -- "injury to or destruction of tangible property." Under Michigan law, the term "to which this insurance applies" subjected

---

[1]The HONORABLE STEPHEN M. REASONER, United States District Judge for the Eastern District of Arkansas.

the general insuring clause to the limitations set forth in the policy exclusions. See Tiano v. Aetna Cas. & Sur. Co., 301 N.W.2d 476, 481 (Mich. Ct. App. 1980). The applicable insurance was defined in the "coverage parts" set forth in the policy's declarations page and attachments. The declarations page stated that the policy provided "Owners', Landlords' and Tenants' Liability Insurance," "Hangarkeepers' Liability Insurance," "Contractual Liability Insurance," and -- most relevant to this case -- "Completed Operations and Products Liability Insurance." An attachment to the declarations page declared, in part, that Completed Operations coverage is provided for "T45 Conversions and Sale of PT6 Engines Installed," the products and work Turbine sold to Cartillar in the underlying transaction here at issue.[2]

The "completed operations" and "products" coverages were defined in a printed portion of the policy entitled "Comprehensive General Liability Insurance -- Coverage Part." These definitions provided in relevant part:

> **"completed operations hazard"** includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from the premises owned by or rented to the named insured. "Operations" include materials, parts, or equipment furnished in connection therewith.

---

[2]This document, policy form AV 00 P038/39 00 1193 (which we will call Form 38/39), clarified the *scope* of the completed operations and products liability coverage part listed on the declaration page. Form 38/39 did not add another coverage part. Indeed, it *limited* the completed operations and products coverages to the operations and products specified on the form, and it listed the premium bases for these coverages. Form 38/39 provided information necessary to define the hazards covered and thus comprised an essential part of the complete policy document. The declarations page described Form 38/39 as an "[e]ndorsement forming a part of this policy." Form 38/39 included the warning, "This Coverage Part shall not be binding on [Reliance] unless attached to the Declarations Page."

**"products hazard"** includes bodily injury and property damage arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others.

Turbine was liable to Cartillar for property damage arising out of Cartillar's reliance upon Turbine's warranties. The damage occurred after Turbine's operations were completed and after Turbine had relinquished the products to Cartillar. Thus, if our analysis of the relevant policy provisions ended here, Turbine's loss would be covered.

However, the policy also contained numerous exclusions, which appeared in the same printed portion of the policy as the definitions of the completed operations and products hazards. Relevant to this case are three so-called "business risk" exclusions:

This insurance does not apply . . .

(*l*)     to **property damage** to the **named insured's products** arising out of such products or any part of such products;

(m)     to **property damage** to work performed by or on behalf of the **named insured** arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

(n)     to **damages** claimed for the withdrawal, inspection, repair, replacement, or loss of use of the **named insured's products** or work completed by or for the **named insured** or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

Applying Michigan law, the district court concluded that these exclusions "are broad, unambiguous, and all-inclusive," they "limit the circumstances under which completed operations coverage exists," and therefore they "preclude coverage for the catastrophic failure of the two engine conversions completed by Turbine for Cartillar." We agree.

Given the structure of the policy, we think it clear that these exclusions apply to each of the coverage parts disclosed on the declarations page and its attachments.[3] Accord Hawkeye-Security Ins. Co. v. Vector Const. Co., 460 N.W.2d 329, 335 (Mich. Ct. App. 1990). This construction is consistent with the purposes of both the products liability and completed operations coverages, and the business risk exclusions.

> The products hazard and completed operations provisions are not intended to cover damage to the insured's products or work project out of which an accident arises. The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable.

Fresard, 327 N.W.2d at 292 (quotation marks and citations omitted). The business risk exclusions serve to limit the products and completed operations coverages in this manner. See generally 9 RUSS & SEGALLA, COUCH ON INSURANCE § 130:8, at 130-19 (3d ed. 1997). Thus, when applicable, these exclusions limit the coverages affirmatively provided by the completed operations and products liability coverage part on which Turbine and Cartillar rely.

---

[3]For example, another attachment to the declarations page, policy form AV 00 P042 00 1193, stated that "the exclusion of **'property damage'** to the **insured's products** . . . shall not apply" to the products described in schedule (e) of Form 38/39, a schedule that did not include the T45 conversion and PT6 engine products. Form 42 was superfluous if the business risk exclusions did not otherwise apply to the completed operations and products coverages listed on Form 38/39.

Like the district court, we are not persuaded by appellants' efforts to avoid application of these business risk exclusions. Turbine argues that the exclusions do not apply because the completed operations hazard specifically included damages arising from reliance on a Turbine warranty, such as Cartillar suffered, whereas the business risk exclusions did not refer to breach-of-warranty damages. However, the business risk exclusions unambiguously applied to *all* property damage to Turbine's products and completed work. That all-inclusive exclusionary language may not be ignored simply because a coverage part referred specifically to one particular cause of that kind of property damage. Turbine further argues that the district court improperly ignored controlling Michigan precedent -- the Michigan Court of Appeals decision in Fresard v. Michigan Millers Mut. Ins. Co., 296 N.W.2d 112, 114-15 (Mich. Ct. App. 1980), that the interaction of the business risk exclusions was ambiguous and therefore must be construed in favor of the insured. However, after Fresard was affirmed by an equally divided Supreme Court of Michigan, 327 N.W.2d 286, the Michigan Court of Appeals declined to follow Fresard, holding that "the exclusions are not to be read cumulatively, but individually [and] each, standing alone, is clear and unambiguous." Hawkeye, 460 N.W.2d at 337. Therefore, we conclude Fresard is not controlling.

Cartillar argues that its catastrophic engine losses are covered because they were caused by a defective engine component, namely, gear failures. We disagree. The exclusions apply to property damage to Turbine's products, both the engines and their defective components. "The words 'product' and 'work' in the exclusion refer to the insured's entire product or work, not just to the component part from which the loss arose." 9 COUCH ON INSURANCE § 129:13, at 129-26. This argument might well have merit had there been property damage to the airplanes in which the engines were installed, because the airplanes were not Turbine product or work. But all property damage to the engines themselves is subject to the business risk exclusions. Cartillar further argues that the "active malfunctioning" exception in another business risk

-6-

exclusion[4] conflicts with exclusions (*l*), (m), and (n), creating an ambiguity that must be resolved in favor of the insured. However, <u>Hawkeye</u> established that the exclusions must be read individually, and that an exception to an exclusion cannot be construed as a grant of additional coverage. <u>See</u> 460 N.W.2d at 336-37. As the damages recovered by Cartillar were unambiguously excluded by exclusions (*l*), (m), and (n), Reliance's policy did not cover Turbine's loss.

The judgment of the district court is affirmed.

BYE, Circuit Judge, dissenting.

The majority holds that the business risk exclusions apply to the additional "completed operations" and "products" coverages purchased by Turbine. Given the particular structure of this policy, I cannot agree. The only insuring agreement, or grant of coverage, that can be found within this policy for those coverages appears in an endorsement — an endorsement that should prevail over the business risk exclusions, not *vice versa.*

The analytic force of the majority opinion rests on how "completed operations" and "products" coverage is *supposed to work*, not on how this disputed policy *actually works*. In its rush to interpret the policy as if it were standard, the majority overlooks the plain fact that this policy is unusual. The tragedy is that, in so doing, the majority ignores several bedrock principles of policy interpretation, particularly the rule that

---

[4]Exclusion (k) provides in relevant part: "This insurance does not apply . . . to bodily injury or property damage resulting from the failure of the named insured's products or work completed . . . if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any insured; *but this exclusion does not apply to bodily injury or property damage resulting from the active malfunctioning of such products or work*" (emphasis added).

coverage endorsements override contrary exclusions in the policy. Thus, I cannot join the majority's approach and respectfully dissent.

My analysis of this policy leads me to conclude that Reliance failed to attach the "coverage part" form for the optional "completed operations" and "products" coverages that Turbine purchased. As a result, this policy does not set forth, in a straightforward manner, an insuring agreement for those coverages. Nor does the policy exclude from coverage any property damage to the insured's product or completed work — damages typically excluded under "completed operations" and "products" coverages. Instead, this policy actually triggers coverage for all property damage described in the definitions of "completed operations hazard" and "products hazard." Those broad definitions encompass the engine damage suffered by Cartillar.

I begin by referring to the standard rules of construction followed in Michigan when examining the language of an insurance policy:

(1)     The contract should be viewed as a whole;
(2)     The intent of the parties should be given effect;
(3)     An interpretation of the contract which would render it unreasonable should be avoided;
(4)     Meaning should be given to all terms;
(5)     Ambiguities should not be forced;
(6)     Conflicts among clauses should be harmonized;
(7)     The contract should be viewed from the standpoint of the insured; and
(8)     The insurer bears the burden of proving an absence of coverage.

See Fresard v. Michigan Millers Mut. Ins. Co., 327 N.W.2d 286, 288-89 (Mich. 1982). With these principles in mind, I consider whether this particular policy covers Cartillar's engine damage.

I start with an examination of the basic policy that Turbine purchased, including the general insuring agreement contained therein; followed by an examination of the pertinent exclusions that limit the general insuring agreement and that might preclude coverage for the engine damage; and finally, conclude with an examination of the endorsements attached to the basic policy that might set forth additional grants of coverage (or exclusions) that might apply to Cartillar's engine damage.

The general insuring agreement located in the Comprehensive General Liability (CGL) section of the policy provides that "[t]he company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of [] bodily injury or [] property damage to which this insurance applies." Joint Appendix (JA) 118. The policy further provides that "'Property damage' means injury to or destruction of tangible property." JA 113.

If my analysis stopped here, Cartillar's engine damage would be covered. The engine damage is "injury to or destruction of tangible property," and thus falls within the policy's broad definition of "property damage." Absent an exclusion, Cartillar's breach of warranty judgment would be covered by the CGL insuring agreement, because the judgment is a sum "which the insured shall become legally obligated to pay."

I move on to an examination of any pertinent exclusions that might remove Cartillar's engine damage from the realm of "property damage" to which the insurance applies. Exclusions (*l*), (m) and (n), the so-called "business risk" exclusions, do remove Cartillar's engine damage from the realm of "property damage" covered by the policy. Cartillar's damage consists solely of property damage to the engines themselves (i.e., Turbine's product or completed work). The standard business risk exclusions specifically exclude coverage for "property damage to the named insured's products" and "to work performed by or on behalf of the named insured." JA 118. Cartillar's engine damage would not be covered if my analysis ended here.

-9-

Knowing, however, that Turbine purchased additional "completed operations" and "products" coverage, as evinced by the declarations page of the policy, I must next examine the endorsements attached to this policy to determine whether any additional insuring agreement *restores* coverage for Cartillar's engine damage. It is axiomatic that when an insured pays an additional premium for an endorsement or rider, the insured does so to receive coverage for something that would otherwise be excluded, or that was never originally covered, by the basic policy itself. Cf. Meridian Mut. Ins. Co. v. Morrow, 443 N.W.2d 795, 797-98 (Mich. Ct. App. 1989) (discussing an endorsement purchased for a specific motorcycle for coverage that would otherwise be excluded under the policy); Porter v. Michigan Mut. Liab. Ins. Co., 293 N.W.2d 799, 284 (Mich. Ct. App. 1980) (noting that an insured could have purchased an endorsement for an additional premium that would have eliminated certain limitations on the policy's coverage).

At this point in the analysis, something seems amiss about this particular policy. The policy's declarations page reflects that Turbine purchased the optional "Coverage Part" for "Completed Operations and Products Liability Insurance" and paid an increased premium for that coverage. See JA 109. The policy's schedule of coverages/limits of liability also describes certain specific "Completed Operations" and "Products" hazards covered by the policy. See JA 116, 131. In addition, one of the endorsement forms attached to the policy sets forth four separate exclusions (elevator, independent contractor, completed operations, and products) that can be triggered by checking a box next to the applicable exclusion. See JA 121. Here, the endorsement form was used to trigger an elevator exclusion, and that box was checked. Significantly, however, the boxes next to the "completed operations exclusion" and "products exclusion" were *not* checked — a further indication that Turbine purchased those coverages. See JA 121.

Yet, despite all these indications that Turbine purchased "Completed Operations and Products Liability Insurance," a search of the entire policy fails to reveal a

"coverage part" for that additional coverage. The only provisions that appear to refer to this additional coverage are contained in the definitions section, where the terms "completed operations hazard" and "products hazard" are defined.

When an insured has purchased coverage for the "completed operations" and "products" hazards, I would normally expect the policy to contain a separate "coverage part" that sets forth the terms and provisions of that additional coverage. I base that expectation primarily upon my understanding of the structure utilized in the standard policy forms promulgated by the Insurance Services Offices, Inc., (ISO) and widely used in the insurance industry. The policy considered in National Union Fire Ins. Co. of Pittsburgh v. Structural Sys. Tech., Inc., 756 F. Supp. 1232, 1237-1241 (E.D. Mo.), judgment amended, 764 F. Supp. 145 (1991), aff'd, 964 F.2d 759 (8th Cir. 1992), exemplifies that structure.

A standard ISO policy typically contains a general insuring agreement in the CGL section of the policy (as does this Reliance policy), providing that the insured "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." See, e.g., Structural Systems, 756 F. Supp. at 1237.

The typical policy also contains (as does this Reliance policy) the standard business risk exclusions for property damage to the insured's product and completed work. See id. at 1238-39.

When an insured purchases the optional coverage for completed operations and products hazard (as Turbine did), a standard ISO policy contains a separate insuring agreement for that additional coverage. See id. at 1241 ("We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' included within the 'products-completed operations hazard' to which this insurance applies."). Despite the presence of the business risk exclusions in the

-11-

CGL section of the policy, this separate "completed operations" insuring agreement contains its own exclusions that specifically apply to property damage to the insured's product and completed work.  See id.

Secondarily, I base my expectation that this Reliance policy should contain a separate "coverage part" for the "completed operations" and "products" hazards upon my examination of this particular contract as a whole — something I am required by Michigan law to do, see Fresard, 327 N.W.2d at 289.

A few examples will explain.  The declarations page indicates that Turbine purchased an additional "Coverage Part" for "Hangarkeepers' Liability Insurance." See JA 109.  Not surprisingly, there is a separate  "coverage part" included in the policy that contains a separate "hangarkeepers' liability" insuring agreement (and separate exclusions) applicable to that additional coverage.  See JA 125.

The declarations page also indicates that Turbine purchased two other optional "Coverage Parts" for "Owners' Landlords' and Tenants' Liability Insurance" and "Contractual Liability Insurance."  See JA 109.  Not surprisingly, a separate endorsement (Form AV 00 P033 00 1193) applies to those two additional "coverage parts," and specifically sets forth the corresponding changes made to the CGL section of the policy.  See JA 110.

Thus, of the four additional coverages purchased by Turbine, the only one lacking a corresponding "coverage part" in the policy is the one for "Completed Operations and Products Liability Insurance."

If my analysis stopped at this point, I would conclude that the missing "coverage part" (and therefore the lack of a clearly-set-forth insuring agreement) for "completed operations" and "products" coverages, when coupled with the undisputed fact that Turbine actually purchased those coverages, renders this policy hopelessly ambiguous.

-12-

Michigan law requires that the policy be viewed from the standpoint of the insured, and that the insurer bears the burden of proving an absence of coverage. See Fresard, 327 N.W.2d at 289. Reliance charged an increased premium for "completed operations" coverage and listed "T45 Conversions" (the completed work at issue) as the "operations" covered by the policy. See JA 116. Yet the absence of a "coverage part" in the policy, explaining what exactly that additional coverage encompasses, leaves me unable to locate any unambiguous provision excluding coverage for the engine damage at issue. Under those circumstances, and in view of the insurer's burden, I would be constrained by Michigan law to interpret the policy in a manner favoring coverage.

A Louisiana court faced a nearly identical situation. See Mike Hooks, Inc. v. Jaco Services, Inc., 674 So. 2d 1125 (La. Ct. App. 1996). There (as here) the insurer acknowledged that the insured had purchased "completed operations" coverage, but the policy contained only a general insuring agreement (to which applied a standard business risk exclusion for damage to the insured's completed work), with no separate provisions regarding the "completed operations" coverage other than those contained in the definitions. See Mike Hooks, 674 So. 2d at 1126-1127. The court concluded that the "missing" provisions for the "products-completed operations hazard" rendered the policy ambiguous, and construed the policy in favor of coverage.

> We are unable to find an unambiguous provision in this policy addressing what the products-completed operations coverage, as found on the declarations page, encompasses. As such, we find that the portions of the policy covering products-completed operations to be ambiguous. Therefore, we are constrained to interpret these terms in a light favoring coverage.

Id. at 1127; accord Kidd v. Logan M. Killen, Inc., 640 So. 2d 616, 620-22 (La. Ct. App. 1994) (superseded by statute on other grounds); Gaylord Chem. Corp. v. Propump, Inc., 753 So. 2d 349, 356-57 (La. Ct. App. 2000); but see Hawkeye-Security Ins. Co. v. Davis, 6 S.W.3d 419, 425 n.4 (Mo. Ct. App. 1999) (acknowledging the

-13-

force of the Louisiana cases, but choosing to ignore them to the extent that they could not be distinguished).

My analysis of the Reliance policy must not stop with the discovery of the missing "coverage part," however. Michigan law requires us to give meaning to *all* terms within the policy, if possible. See Fresard, 327 N.W.2d at 289. An examination of the entire policy reveals that meaning can be given to the additional "completed operations" and "products" coverages purchased by Turbine, despite Reliance's failure to attach the proper "coverage part."

As previously noted, the policy's schedule of coverages/limits of liability (Form 38/39) describes certain specific "Completed Operations" and "Products" hazards covered by the policy. See JA 116. "T45 Conversions" are specifically listed in the hazard schedule under hazard (d) for "Completed Operations." See JA 116.

A second endorsement (Form 42) refers to the hazard schedule in the first endorsement, and provides, in pertinent part, that

> [t]his insurance does not apply to **damages** because of **bodily injury** or **property damage** included within the **completed operations hazard** or included within the **products hazard** unless the operations or products are described in the schedule under hazards (d) and (e) - Completed Operations or Products.

JA 122 (emphasis in original).

By necessary implication, this second endorsement provides that the policy *does apply* to property damage included within the completed operations hazard or products hazard *if* the operations or products are described in the schedule under hazards (d) or (e). "T45 Conversions" are indeed listed under hazard (d) in the schedule.

-14-

These two endorsements, read together, contain an insuring agreement for the additional "completed operations" and "products" coverages purchased by Turbine. My careful analysis of the entire policy satisfies me that these are the only provisions within this policy that can possibly be construed as the insuring agreement for those additional coverages.

Thus, having finally identified an insuring agreement for the "completed operations" and "products" coverages, I continue my analysis. Endorsement Form 42 refers to "completed operations hazard" and "products hazard" in bold letters, meaning those terms are defined elsewhere in the policy. I therefore proceed to the definitions of those terms to determine the scope of the "property damage" included within them.

The definition of "Completed operations hazard" provides that

"[C]ompleted operations hazard" includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured. "Operations" include materials, parts, or equipment furnished in connection therewith.

JA 112.

The definition of "Products hazard" in the policy provides that

"[P]roducts hazard" includes bodily injury and property damage arising out of the named insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others.

JA 113.

These definitions of "completed operations hazard" and "products hazard" compel the conclusion that this policy covers Cartillar's engine damage. In this policy, Endorsement Form 42 gives life to the entire definitions of "completed operations hazard" and "products hazard" as a grant of coverage. The only limitations placed on that coverage are those already contained within the definition of "completed operations hazard," which provides that

> The completed operations hazard does not include bodily injury or property damage arising out of
>
> | (a) | operations in connection with the transportation of property, unless the bodily injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof, |
> |---|---|
> | (b) | the existence of tools, uninstalled equipment or abandoned or unused materials, or |
> | (c) | operations for which the classification stated in the policy or in the company's manual specifies "including completed operations." |

JA 112. Although property damage arising out of certain operations is specifically excluded by this definition, conspicuously absent is any exclusion for property damage to the insured's products or completed work.

Furthermore, the "property damage" covered by the policy includes *all* "injury to or destruction of tangible property." "Destruction of tangible property" can "arise out of operations" or "reliance upon a representation or warranty" with respect to both (1) damages to the product or completed work itself, and (2) damages to other property. Thus, the broad grant of coverage in this policy necessarily encompasses the engine damage at issue.

I acknowledge that many cases and secondary authorities have addressed the typical scope and limits of "completed operations" and "products" coverages. Those authorities indicate that

> [t]he products hazard and completed operations provisions *are not intended* to cover damage to the insured's products or work project out of which an accident arises. The risk *intended to be insured* is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable.

Henderson, Insurance Protection for Products Liability and Completed Operations — What Every Lawyer Should Know, 50 Neb. L. Rev. 414, 441 (1971) (citation omitted) (emphasis added); see also Fresard, 327 N.W2d at 292 (citing the above law review article for the proposition that "completed operations" coverage is not intended to cover damages to the insured's products or completed work). But that reasoning does not apply here, because this policy is atypical.

As I discussed above, when an insurer grants additional coverage for *all* bodily injury and property damage included within the definitions of "completed operations hazard" and "products hazard," the insurer typically re-excludes (if you will) coverage for damage to the insured's product and completed work. See, e.g., Structural Systems, 756 F. Supp. at 1239, 1241. Typical "completed operations" coverage requires separate

damage-to-the-product and damage-to-the-work exclusions precisely because the additional grant of coverage would otherwise encompass damage to the insured's product and completed work.

The Reliance policy contains no separate damage-to-the-product and damage-to-the-work exclusions applicable to the additional coverage. Undoubtedly, those separate exclusions would have been contained in the "coverage part" that Reliance failed to attach to this policy. The policy that Reliance *actually* issued is the only one with which the court can be concerned, however, and any exclusions that appear in that policy must be strictly construed against the insurer. See Farm Bureau Mut. Ins. Co. of Michigan v. Moore, 475 N.W.2d 375, 377 (Mich. 1991).

The majority holds that the additional "completed operations" and "products" coverages are subject to the business risk exclusions in the CGL section of the policy. Given the particular nature and structure of this policy, that holding is unsound. In this policy, the only grant of coverage for "completed operations" and "products" insurance is located within an *endorsement.* The broad grant of coverage in that *endorsement* conflicts with the business risk exclusions to the extent that the endorsement provides coverage for all property damage included within the definitions of "completed operations hazard" and "products hazard." "When a conflict arises between the terms of an endorsement and the form provisions of an insurance contract, the terms of the endorsement prevail." Hawkeye-Security Ins. Co. v. Vector Constr. Co., 460 N.W.2d 329, 334 (Mich. Ct. App. 1990) (citing Peterson v. Zurich Ins. Co., 225 N.W.2d 776, 779 (Mich. Ct. App. 1975)). Under this universally accepted rule of construction, the business risk exclusions in this policy should and must be viewed as subject to the endorsement, not *vice versa*.

The fact that Endorsement Form 42 merely incorporated definitions already found within the form provisions of the policy does not change my conclusion. The

form definitions, incorporated into the endorsement, still prevail over the inconsistent business risk exclusions. Two Michigan cases support my conclusion.

In Jones v. Philip Atkins Const. Co., 371 N.W.2d 508 (Mich. Ct. App. 1985) and Tiano v. Aetna Cas. & Sur. Co., 301 N.W.2d 476 (Mich. Ct. App. 1981), the Michigan Court of Appeals addressed insurance policies with definitions of "completed operations hazard" and "products hazard" identical to the form definitions at issue in this particular policy. In those cases, however, the form definitions were incorporated into *exclusion* endorsements, rather than *coverage* endorsements. See Jones, 371 N.W.2d at 510-11; Tiano, 301 N.W.2d at 478-79.

Both Jones and Tiano held that the form definitions of "completed operations hazard" and "products hazard," when incorporated into an endorsement, prevailed over inconsistent form provisions in the policy. See Jones, 371 N.W.2d at 512 ("The completed operations exclusion appears on a separate endorsement. This Court has previously held that endorsements or riders prevail over form provisions of a contract"); Tiano, 301 N.W.2d at 480 ("If the language of an endorsement and the general provisions of the policy conflict, the endorsement will prevail, and the policy remains in effect as altered by the endorsement").

An endorsement overrides inconsistent form provisions in the policy whether it grants, or excludes, coverage. Even though the coverage endorsement in this policy merely incorporated definitions of "completed operations hazard" and "products hazard" from within the policy itself, the resulting grant of coverage is not subject to the business risk exclusions.

The flaw in the majority's reasoning is its failure to identify an insuring agreement for Turbine's "Completed Operations and Products Liability Insurance." The majority refers only to the policy's definitions of "completed operations hazard" and "products hazard" when discussing this issue, implying that those definitions comprise

the additional "coverage part." It is axiomatic, however, that a definition, standing alone, cannot constitute an insuring agreement. See, e.g., Hawkeye-Security Ins. Co. v. Davis, 6 S.W.3d at 423. If the additional grant of coverage for "completed operations" and "products" insurance is not within Endorsement Form 42, the endorsement I have identified, then the insuring agreement for those additional coverages appears nowhere within this policy.

The majority and I may disagree about whether or not a "coverage part" is missing from this policy, but I do not believe that the majority may side with Reliance in that dispute. Michigan law requires us to resolve ambiguities in favor of the insured, not the insurer.

For the above reasons, I dissent.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-20-